Argued and submitted August 13, 2015, reversed November 2, 2016

In the Matter of V. R. F.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. C. F.,
K. C. F., and V. R. F.,
*Appellants.*

Lane County Circuit Court
14609J;
Petition Number 14609J01;
A158834 (Control)

In the Matter of G. A. F.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

K. C. F.,
K. C. F., and G. A. F.,
*Appellants.*

Lane County Circuit Court
14610J;
Petition Number 14610J01;
A158844

383 P3d 931

Megan L. Jacquot argued the cause and filed the brief for appellant G. A. F.

Caitlin Mitchell argued the cause and filed the brief for appellant V. R. F.

Michael Vergamini argued the cause and filed the brief for appellant father K. C. F.

Ashlee Rochelle Wiese argued the cause for appellant mother K. C. F. With her on the brief was Eckart Wostmann Wiese, LLC.

Judy C. Lucas, Assistant Attorney General, argued the cause for respondent. With her on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Duncan, Presiding Judge, and Flynn, Judge, and Haselton, Senior Judge.

## DUNCAN, P. J.

In this juvenile dependency case, mother and father appeal a judgment determining that their daughters, A and B, ages 11 years and 18 months at the time of the hearing, are within the jurisdiction of the juvenile court pursuant to ORS 419B.100(1)(c), as a result of conditions or circumstances that endanger their welfare. The children also appeal, contending that the court erred in assuming jurisdiction. Because we agree with parents and the children that the evidence is insufficient to support the juvenile court's determination that there is a current risk of harm, we reverse the jurisdictional judgment.

Under ORS 419B.100(1)(c), the juvenile court has exclusive jurisdiction over a minor "[w]hose condition or circumstances are such as to endanger the welfare" of the minor. In reviewing the juvenile court's jurisdictional determination, the question is whether the Department of Human Services (DHS) has proved, by a preponderance of the evidence, that the child's welfare is endangered by the parents' conduct. *Dept. of Human Services v. A. F.*, 243 Or App 379, 385-86, 259 P3d 957 (2011). On appeal, we view the evidence, as supplemented by permissible derivative inferences, in the light most favorable to the trial court's determination and assess whether, when so viewed, the record was legally sufficient to permit that outcome. *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P2d 444 (2013).

The parents are married. The family came to the attention of DHS in May 2014, when it was contacted by mother's psychotherapist, Cleary. Cleary had been counseling mother regarding marital conflict.[1] Cleary testified at the jurisdictional hearing that, based on mother's description of father's conduct, she became concerned that mother is a victim of emotional abuse.[2] Cleary testified that in October

---

[1] Cleary testified that mother "felt that if she could be more mindful that she would be better able to comply with what her husband wanted her to do differently in their home and relationship."

[2] Cleary testified that, although there was not much indication of physical abuse, there was emotional abuse. Cleary had the impression that father was "gaslighting" mother—systematically breaking down her self-esteem "by asserting [her] worthlessness and causing [her] to question [her] own version of reality."

2014, when mother reported that father had threatened suicide and homicide, Cleary reported to DHS that father had subjected mother and the children to domestic violence.

Meyer, a DHS caseworker, testified that he first met with mother on November 7, 2014. By that time, father had a pattern of threatening suicide, but he also made regular threats of violence, which had become more frequent, and were made in a calm and matter-of-fact way.[3] Based on his interview of mother, Meyer concluded that it would not be safe for the children to be with father and told mother not to take them home; he arranged for mother to go to a hotel.

DHS filed a dependency petition on November 13, 2014. The petition alleged jurisdiction based on allegations that the children are at risk of harm because father exposes them to domestic violence against mother, and because father's substance abuse and mental health condition interfere with his ability to safely parent. The petition further alleged that mother needs the assistance of the court and DHS to protect herself and the children from the violence

---

Cleary learned from mother that father was abusing alcohol and was controlling and manipulative. To manipulate mother, father frequently has threatened suicide, and had recently warned her that she should fear homicide. Mother told Cleary that father also threatened to have her committed and to call "authorities" if mother consumed alcohol while breastfeeding. Father maintains surveillance cameras inside the house.

Cleary learned that there were guns in the house and, with Cleary's encouragement, mother removed them, but not without a major confrontation with father in front of the children, in which father threatened to punch and slap her.

[3] For example, Meyer testified that, on the day he first met with mother, father had told her, "You should consider me to be on the suicide watch," and, "Maybe you should consider me to be on the homicide watch." Father told mother to move "before I hit you." Meyer testified that mother described regular comments by father such as, "I hope you die soon. Things of that nature." Mother told Meyer that father had said he hoped she would die soon, or hoped she would die in a fatal car wreck. Meyer testified that mother described an incident in which father became upset with her for giving the older daughter "Emergen-C" for a cold and threw water in mother's face at the dinner table while the children were present. After that incident, the younger child disengaged from father. Mother told Meyer that father had told her in front of the children that he had liver cancer, although as far as she knew, he had never had a medical diagnosis or treatment.

Meyer met with the older daughter, A, who expressed concern for her father's wellbeing after being separated from the family. A told Meyer that she had witnessed arguments between her parents, had heard father threaten to slap mother, had seen him grab mother's arm, and had seen parents push each other during an argument.

and control of father and lacks legal custody to protect the children. Meyer testified that the petition's allegation of domestic violence was based on father's threats of violence and the impact of father's behavior on the children's emotional well-being. DHS concedes that there has been no physical abuse.

After the filing of the petition, DHS caseworker Kozicky worked with the family. Mother reported to Kozicky that father was remorseful, that he had quit drinking and smoking marijuana, and that he had burned his medical marijuana card. Father moved out of the house so that mother and the children could move back in, and promised that he would never threaten mother again. However, father continued to monitor the home with security cameras.

On December 23, 2014, mother reported to Cleary that father had "gone back on his promise not to be cruel and manipulate." But then, on December 27, 2014, mother expressed concern to Kozicky that the "forced separation" was harming the family, and she urged a prompt resolution.[4] After that communication from mother, DHS filed an amended petition, adding an allegation that mother "fails to understand the emotional damage and safety risk posed by father, and failed to take protective action. The child[ren] will not be safe until the reasons for mother's protective failures are remedied."

Kozicky testified that, although father's behavior has not included physical violence, it nonetheless constitutes domestic abuse, which is about power and control and

---

[4] In an email to a DHS caseworker, mother wrote:

"The girls are doing well, but we are all needing more certainty about the timeline of this case. They miss their Dad enormously. This whole process has had a huge negative impact on all of us. * * * We are all feeling the impact of this forced separation in profound ways. I believe that DHS's intention is truly what's best for us as a family, which is why I'm telling you that's NOT what's happening. * * *

"I fully accept that each of us has work to do to heal & create a better home environment. We are all doing everything we can to accomplish this. In the meantime, the girls are missing out on connection and guidance from their father, I'm having to hire more people to help me run the household, and father is not only exiled from his home & daughters, but he's also struggling to run his newly started business. * * * We need some clearer idea of what is to come and when father can return home. He is needed here, and he needs his family."

encompasses emotional abuse. She testified that mother "has the standard, typical amount of denial as a domestic abuse victim. It's difficult for her to see." In Kozicky's view, it would not be safe for father to return to the house, because the domestic abuse issues have not been addressed. Kozicky testified that domestic abuse is harmful to children.[5]

Father testified at the hearing that he previously had smoked marijuana in excess and had abused alcohol, but that since the filing of the jurisdictional petition, he has not consumed either alcohol or marijuana. He regularly attends substance abuse counseling, submits to weekly urinalysis (UAs), and, at the time of the hearing, had been sober for 65 days and had abstained from marijuana for 75 days. He admitted to having argued with mother in front of the children but denied having threatened mother in front of them. He admitted that he told mother that *she* should be on suicide watch, "and maybe homicide watch," and that "it was a very stupid thing to say." But he explained that he did not intend those statements as actual threats and he did not believe that mother took them seriously. He stated that his comments regarding suicide were made in anger, "from a place of * * * very high upset" and were intended only to end an argument. He said that he is not suicidal and that he would not hurt himself, mother, or the children. He denied ever having hit or kicked mother, but admitted that, eight or nine years earlier, he had pinned mother down in bed, and said he felt ashamed by that conduct.

Mother testified that she did not consider father's statements regarding suicide and homicide to be genuine threats and that she did not think he would hurt her or the children. She confirmed father's testimony that A had not been present when father made the homicide remark.

A, who testified that she is a "straight A" student in school, said that she once heard father threaten suicide

---

[5] Kozicky described generally the effect of domestic abuse on a child:

"That you become used to the fact that this is just how it is. We pretend things didn't happen that did. You have a really good fantasy, imagination going on. In this case it—[A] appears to believe that she can save her father, that he—he, as most abusive men, has acted like the victim. He's the victim here. It's everyone else's fault. And she really believes that she can fix that."

but that she had not heard him threaten homicide, and that she did not believe that he would commit suicide or harm mother or herself.

The court concluded that DHS had "met its burden of proof with regard to each of the allegations in each case."[6] In its ruling from the bench, with respect to the domestic abuse allegation, the court expressed concern about father's need to control mother, citing in particular the incident eight or nine years earlier where father pinned mother down in bed, father's threats of physical harm, and his recent response to a minor disagreement by throwing water in mother's face. With regard to the mental health allegation, the court opined that, although father has not been diagnosed with a mental disorder, his conduct—in particular his anger and his need for control of another adult—demonstrates that there is an "underlying problem" that poses a risk of harm and that has not yet been addressed. And the court found that father's period of abstention from marijuana and alcohol, although a start in the right direction, was relatively brief. The court concluded that father's unaddressed emotional or mental health issues, his past substance abuse, and the domestic violence posed a risk of harm to the children. As to mother, the court found that she was in denial and lacked appreciation for the risk of harm posed by father to the children.

With respect to the effect of parents' behavior on the children, the court noted that A seemed close to parents and that, throughout the hearing, she sat next to father, holding his hand. But the court also noted that being close to one's parents does not exclude the possibility of an effect from witnessing abuse; along those lines, the court said that the court was struck that A—who was only 11 years old—was sufficiently concerned about parents' conduct that she had developed a "safety plan" and had sought out community resources in the event she needed to leave home because of her parents' conflicts. The court commented that A seemed

---

[6] The court explained:

"I relied particularly on the impact on [B] of witnessing the water throwing incident, that the child withdrew from contact with [father] after that occurred. I think that was a violent response on his part and I think it had an impact that was observable and negative on [B]."

mature for her age and expressed concern that there had been a "role reversal" and that A was "parenting the parent." The court assumed jurisdiction and ordered both parents to participate in a psychological evaluation and services to address domestic violence.

To establish a basis for juvenile court jurisdiction for purposes of ORS 419B.100(1)(c), the state must prove, by a preponderance of the evidence, ORS 419B.310(3), that a child's welfare is endangered because, under the totality of the circumstances, there is a "current threat of serious loss or injury to the child that is reasonably likely to be realized." *A. F.*, 243 Or App at 386. There must be a nexus between the parent's conduct or condition and harm to the child. *Dept. of Human Services v. D. S. F.*, 246 Or App 302, 314, 266 P3d 116 (2011). It is not sufficient for the state to prove that a parent's conduct *could* negatively affect the child. *A. F.*, 243 Or App at 387. The threat of harm must be serious and reasonably likely to be realized. *Dept. of Human Services v. S. D. I.*, 259 Or App 116, 118, 312 P3d 608 (2013). The state bears the burden to prove that the threat of harm exists at the time of the jurisdictional hearing. *Dept. of Human Services v. D. M. H.*, 272 Or App 327, 355 P3d 206 (2015). A current threat of harm cannot be found based on speculation that conditions or circumstances persist at the time of hearing. There must be evidence that such threats in fact persist. *Dept. of Human Services v. S. P.*, 249 Or App 76, 90-91, 275 P3d 979 (2012). On appeal, the parents and children assert that the evidence in this case simply does not support a finding of a current risk of harm from father's conduct or mother's failure to protect them from it.

Domestic violence between parents poses a threat to children when it creates a harmful environment for the children and the offending parent has not participated in remedial services or changed his or her threatening behavior. *Dept. of Human Services v. C. F.*, 258 Or App 50, 308 P3d 344, *rev den*, 354 Or 386 (2013). The state contends that evidence of father's past domestic abuse and threats of violence in front of the children, father's lack of treatment to address that issue, and both parents' denial of the adverse affect on the children, support the juvenile court's findings.

But the evidence in this record is legally insufficient to the court's finding of a risk of serious harm to the children. As we held in *A. F.*, the requirement that the child be endangered is significant; the child must be exposed to "danger," that is, conditions or circumstances that involve "being threatened with serious loss or injury." 243 Or App at 386. The threat of serious harm to the child cannot be speculative. There must be a reasonable likelihood that the threat will be realized. We have repeatedly emphasized that requirement. *See Dept. of Human Services v. M. Q.*, 253 Or App 776, 785, 292 P3d 616 (2012). As we said in *S. D. I.*:

> "[I]n order for a juvenile court to take jurisdiction over a child on the ground that the child is endangered, the state must establish both that the child is at risk of a certain severity of harm and that there is a reasonable likelihood that the risk will be realized. To do so, the state must present evidence about both the severity of the harm and the likelihood that it will occur. In this case, it bears emphasizing that a court cannot take jurisdiction over a child based solely on a risk of *some* harm; the type, degree, and duration of the harm must be such that exposure to a reasonable likelihood of that harm justifies juvenile court jurisdiction."

259 Or App at 121-22 (emphasis added). Here, although there is evidence that father has been emotionally abusive of mother and that the parents' conflict has affected the children, apart from Kozicky's description of the general effect that domestic abuse can have on a child, there is no evidence of a present risk of serious harm that is reasonably likely to occur. *See also State ex rel Dept. of Human Services v. D. T. C.*, 231 Or App 544, 554, 219 P3d 610 (2009) (father's drinking, which frightened his children and caused him to be mean and controlling, was "not ideal parenting," but was "not inherently or necessarily more harmful or dangerous than other varieties of parenting that would, by no stretch of the imagination, justify state intervention into the parent-child relationship"). That is, on this record, we conclude that there is insufficient evidence of the type, degree, and duration of harm necessary to establish a threat of serious loss or injury, and we conclude for that reason that the juvenile court erred in assuming jurisdiction.

Reversed.