AOYAGI, J.
*227 The juvenile court asserted jurisdiction over J, a five-year-old girl, based on parents' substance abuse and domestic violence in parents' home. Father appeals the jurisdictional judgment. He argues that DHS failed to prove that any domestic violence occurred. With respect to substance abuse, father does not deny drug use but argues that DHS failed to prove that parents' drug use creates a non-speculative risk of serious loss or injury to J that is likely to be realized in the absence of dependency jurisdiction. For the reasons that follow, we agree with father that DHS's evidence was insufficient to establish jurisdiction. Accordingly, we reverse.
I. FACTS
When reviewing a judgment of jurisdiction, we determine whether, on the record before it, the juvenile court erred in making the statutorily prescribed determination. Dept. of Human Services v. N. P. , 257 Or.App. 633, 639, 307 P.3d 444 (2013). We view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's disposition and assess whether, when so viewed, the record was legally sufficient to permit the outcome. Id . at 639-40, 307 P.3d 444. We state the facts in accordance with that standard, as well as including uncontroverted historic and procedural facts.
In December 2016, DHS received a report that J was exposed to a dangerous person. A DHS caseworker interviewed J at school and interviewed parents at their home. DHS did not find sufficient evidence to proceed and was in the process of closing the case when, on February 3, 2017, DHS received a report regarding a concerning photo on J's phone. On February 4, 2017, an employee of Jackson County Children's Advocacy Center interviewed J. A DHS caseworker and two police officers observed the interview. DHS determined that J had taken the photo herself, resolving the concern about the photo.
During the course of the interview on February 4, J made certain disclosures unrelated to the photo. First, she disclosed that parents smoke marijuana. J said parents told *228 her that they "smoke pot," and she described their bong as see-through with a star on it. J stated that parents keep the pot (by which she appears to mean the bong) on top of their "secret stuff" in a little box. She does not know what is in the box because it is secret.
J also admitted that parents sometimes fight or argue. In J's own words:
"Q: Do mom and dad ever have fights or arguments?
"A: Yeah they do * * *.
"Q: So tell me what happens when mom and dad have arguments.
"A: They just fight fight fight fight fight and fight and it's just that it hurts my feelings. I think that dad's gonna-last time my dad fighted so bad in our old house he punched a hole in the wall and guess what I think that's gonna happen again. He said no.
"Q: So dad punched a hole in the wall?
"A: Yeah when we were in our old house but he's not gonna do it ever again. He's not gonna fight in front of me ever again.
*59 "Q: Have you ever seen dad punch anything else that's different from the wall?
"A: No.
"Q: When mom and dad have arguments does anyone ever hit?
"A: No he just hits his arm.
"Q: When mom and dad have arguments does anyone ever cry?
"A: No.
"Q: And you said it hurts your feelings?
"A: It doesn't hurt my feelings so bad I cry."
As a result of those disclosures, a DHS caseworker, accompanied by two police officers, went to visit J's parents later the same day. Parents were living at a motel. Mother was alone in the motel room when DHS and the police *229 arrived. As she opened the door, the officers could see a small lock box lying open on the bed with cash and a baggie of white powder visible inside it. The officers were questioning mother when father arrived. They arrested father for possession and distribution of methamphetamine. They ultimately seized a baggie of suspected methamphetamine and $927 from the lock box on the bed, an electronic scale and another baggie of suspected methamphetamine from the motel room safe, a methamphetamine pipe and a baggie of marijuana from an unspecified location in the motel room, and a bong from the motel room bathroom.
DHS immediately went to grandmother's house and took custody of J. The parties agree that the record is sparse as to J's precise living arrangements at that time. However, J was splitting her time in some manner between staying with parents at the motel and staying with grandmother at grandmother's house. When DHS went to the motel on February 4, J had been staying with grandmother since at least the previous evening and possibly longer. At the motel, a DHS caseworker spoke with mother about the possibility of eventually placing J with grandmother. In that process, she asked mother some questions about drug use and safety. Mother denied recent drug use. When asked about the wall-punching incident that J mentioned, mother confirmed that father had punched a hole in the wall at one time and that it scared her. Asked if she felt safe in the home, mother answered, "Most of the time." She did not elaborate.
On February 6, parents met with a DHS caseworker, who questioned them about their drug use. Both denied being under the influence of methamphetamine at the meeting, but the caseworker suspected that they were. As for historic drug use, mother admitted that she and father had "relapsed," that they had been using methamphetamine for three and a half months, and that things "started to really go downhill for them" after DHS's visit in December. As mother described their illegal drug use to the caseworker, father interrupted mother, saying, "You need to stop talking and shut up." The meeting ended shortly thereafter. Through a window in her office, the caseworker saw parents walking to their car to depart. She could not hear *230 what father was saying but perceived that he was angry and yelling at mother.
DHS filed a dependency petition, alleging jurisdiction over J on five bases:
"A. The [mother]'s substance abuse interferes with her ability to safely parent the child.
"B. Domestic violence in the mother's home creates a harmful environment for the child.
"C. The [father]'s substance abuse interferes with his ability to safely parent the child.
"D. Domestic violence in the father's home creates a harmful environment for the child.
"E. The father is involved in criminal activities that interfere with his ability to safely parent the child."
The court held a jurisdictional hearing in June 2017. DHS voluntarily dropped jurisdictional basis E.[1] The juvenile court found jurisdiction *60 on the other four bases. Father appeals.
II. ANALYSIS
The juvenile court has jurisdiction over a child whose "condition or circumstances are such as to endanger the [child's] welfare." ORS 419B.100(1)(c). To establish jurisdiction, DHS must present evidence "sufficient to support a conclusion that the child's condition or circumstances expose the child to a current threat of serious loss or injury that is likely to be realized." Dept. of Human Services v. A. W. , 276 Or.App. 276, 278, 367 P.3d 556 (2016). DHS must establish the "type, degree, and duration" of the harm at issue. Dept. of Human Services v. S. D. I. , 259 Or.App. 116, 121, 312 P.3d 608 (2013). It must establish "a nexus between the allegedly risk-causing conduct and the harm to the child."
*231 Dept. of Human Services v. C. J. T. , 258 Or.App. 57, 62, 308 P.3d 307 2013). It also must prove that the risk of harm is "nonspeculative"; that is, there must be "a reasonable likelihood that the threat will be realized." Dept. of Human Services v. A. L. , 268 Or.App. 391, 397, 342 P.3d 174 (2015) (internal quotation marks omitted).
A. Scope of the Appeal
As a preliminary matter, we address the scope of the appeal. The juvenile court asserted jurisdiction on four bases, two regarding father and two regarding mother. Only father has appealed, but he challenges all four bases of jurisdiction. Father relies on Dept. of Human Services v. S. P. , 249 Or.App. 76, 275 P.3d 979 (2012), for the proposition that all four bases are properly before us. DHS argues that we should consider only the allegations regarding father, citing no contrary authority but seeking to distinguish S. P.
In S. P. , the juvenile court asserted jurisdiction over a newborn child on five bases: mother's developmental delays and mental health concerns, mother's ability to meet the child's basic needs, father not presenting himself as a parenting resource, father's mental health concerns and anger control issues, and father having not demonstrated the ability to provide the child with necessary care. Id . at 83, 275 P.3d 979. Only mother appealed, challenging all five bases of jurisdiction. Id . at 84, 275 P.3d 979. DHS argued that this court should review only the allegations pertaining to mother, but we rejected that argument and concluded that all of the allegations were properly before us. Id . at 86, 275 P.3d 979. DHS's theory of jurisdiction in the juvenile court had been, "essentially, that parents in combination are unable to safely parent [the child] given their-and particularly, mother's-cognitive impairments." Id . (emphasis in original). The juvenile court had viewed "the allegations regarding mother and father together " and "considered parents as a unit." Id . at 87, 275 P.3d 979 (emphasis in original). As a result, on appeal, we concluded that the "sufficiency of the allegations as to mother [was] necessarily intertwined with the sufficiency of the allegations with respect to father." Id .
The same is true here. DHS and the juvenile court viewed parents as a unit. The allegations and evidence regarding father and the allegations and evidence regarding *232 mother were closely intertwined. DHS's theory of the case, essentially, was that parents could not provide a safe home for J because both use methamphetamine and there is domestic violence in their joint home. The juvenile court accepted that theory and asserted jurisdiction consistent with it. Given how DHS presented its case and the juvenile court decided it, we would have to artificially separate the allegations regarding father from those involving mother for the first time on appeal to evaluate them independently. That is not appropriate here. Cf. Dept. of Human Services v. E. M. , 264 Or.App. 76, 84, 331 P.3d 1054 (2014) ("We conclude that reversal of a jurisdictional judgment only as to one parent is inconsistent with the nature of the jurisdictional judgment in this case." (Internal quotation marks omitted.). We conclude that all four bases on which the juvenile *61 court asserted jurisdiction are properly before us.
B. Domestic Violence
Turning to the merits, we begin with jurisdictional bases B and D: that domestic violence in parents' home creates a harmful environment for J.
DHS was required to prove by a preponderance of the evidence both that domestic violence occurred in parents' home and that it endangered J's welfare within the meaning of the jurisdictional statute. ORS 419B.310(3) ; Dept. of Human Services v. D. T. C. , 231 Or.App. 544, 553, 219 P.3d 610 (2009). Here, DHS offered evidence that parents have verbally fought in front of J in the past, which hurt J's feelings but not so much that she cried; that father punched a hole in a wall at their "old house" the "last time" parents fought, which scared mother and J, and which spurred father to promise J that they would never fight in front of her again; that mother feels safe "[m]ost of the time," which, by implication, means not all of the time; that father interrupted mother while she was disclosing parents' illegal drug use to a DHS caseworker shortly after father was arrested and J taken, telling her, "You need to stop talking and shut up," and then appeared to be angry and yelling at her as they walked to their car; and that, according to a DHS caseworker, domestic violence "includes power and control, emotional abuse, financial exploitation, and control."
*233 Based on the foregoing evidence, the juvenile court concluded that DHS had proved jurisdiction over J due to domestic violence in parents' home. It stated:
"I think the evidence is consistent with showing that the domestic violence has begun to have an impact on [J] by the fact that she said she was scared and it hurt her feelings. And as we know domestic violence can have a profound impact on children's brain development, their ability to form attachments. And so I think even just exposure to power and control and the yelling, which I think is what's largely going on here, which is clearly enough for domestic violence, put her at risk. And I do think that there is a nexus between the evidence that has been presented today and the risk of harm to the child. There is a risk of harm with domestic violence that occurs in front of her and that domestic violence is between her parents and she has witnessed it and heard it."
As a starting point, it is unnecessary to decide the complicated question raised by father's arguments as to what constitutes "domestic violence." We have never categorically defined domestic violence and need not do so now. See, e.g. , State v. S. T. S. , 236 Or.App. 646, 656 n. 1, 238 P.3d 53 (2010) (declining to decide, in juvenile dependency case involving physical violence, threats, breaking objects, and verbal abuse, whether verbal abuse "standing alone" would create jurisdiction). That is so because using the term "domestic violence" to describe conduct does not change the ultimate inquiry in a dependency case: whether violent or aggressive behavior by an adult in the home endangers the child's welfare. The focus must always be on the child. Dept. of Human Services v. W. A. C. , 263 Or.App. 382, 393, 328 P.3d 769 (2014).
The evidence offered by DHS in this case was insufficient to establish jurisdiction over J based on domestic violence. There is no evidence that father has ever hit or threatened mother, or that mother has ever hit or threatened father. The juvenile court found that "exposure to power and control and the yelling" was "what's largely going on here." On that point, there was evidence that parents have argued in front of J in the past and that J worries they will do so again. DHS offered no evidence, however, that parents have *234 continued to argue in front of J since their "last" fight at the "old house," let alone done so in a manner or to a degree that exposes J to a non-speculative "current threat of serious loss or injury that is likely to be realized." A. W. , 276 Or.App. at 278, 367 P.3d 556. Further, the record contains no evidence to support the juvenile court's statement that "we know domestic violence can have a profound impact on children's brain development, their ability to form attachments" and that "even just exposure to power and control and the yelling" puts a child at risk. DHS offered no evidence regarding the *62 harm to children associated with exposure to "power and control" or "yelling," generally or specific to J's circumstances.
Our decision in Dept. of Human Services v. K. C. F. , 282 Or.App. 12, 20, 383 P.3d 931 (2016), is instructive. In that case, the juvenile court took jurisdiction of two children based on the father exposing them to domestic violence and the father's substance abuse and mental health condition. The father had repeatedly communicated threats to the mother, including but not limited to threats of suicide. A DHS caseworker testified that the father's conduct, although not physically abusive, constituted "domestic abuse, which is about power and control and encompasses emotional abuse." Id . at 16-17, 383 P.3d 931. We reversed on appeal. We emphasized that, to establish jurisdiction, the child must be endangered by the parent's conduct, i.e. , "threatened with serious loss or injury." Id . at 20, 383 P.3d 931. Also, "a risk of some harm" is not enough: "the type, degree, and duration of the harm must be such that exposure to a reasonable likelihood of that harm justifies juvenile court jurisdiction." Id . (emphasis in original; internal quotation marks omitted). That requirement was not met in K. C. F. "[A]lthough there is evidence that father has been emotionally abusive of mother and that the parents' conflict has affected the children, apart from [the caseworker's] description of the general effect that domestic abuse can have on a child, there is no evidence of a present risk of serious harm that is reasonably likely to occur." Id .
Similarly, in A. W. , 276 Or.App. at 276, 367 P.3d 556, we reversed a judgment of jurisdiction based in part on domestic violence where "there was no evidence that A had witnessed any physical violence, and, even if A had seen or heard disagreements between his parents or between his parents and *235 grandfather, DHS did not present evidence that such exposure put A at risk of serious harm or injury." In D. T. C. , 231 Or.App. at 554, 219 P.3d 610, we concluded that the father's drinking, which frightened his children and caused him to be "mean and controlling," was "not ideal parenting" but was "not inherently or necessarily more harmful or dangerous than other varieties of parenting that would, by no stretch of the imagination, justify state intervention into the parent-child relationship." (Internal quotation marks omitted.)
In this case, there is evidence that parents have yelled at each other in J's presence, at least in the past; that father once punched a wall at their "old house," which scared J and mother and led father to promise J that he and mother would never fight in her presence again; and that father interrupted mother and later yelled at mother when J was not present, after she disclosed parents' illegal drug use to a DHS employee. Such conduct is not ideal by any means. As in K. C. F. and A. W. , however, DHS failed to put in evidence sufficient to prove that parents' conduct toward one another is of a nature or severity that creates a current threat of serious loss or injury to J that is likely to be realized.[2] The juvenile court erred in asserting jurisdiction over J based on domestic violence in parents' home.
C. Substance Abuse
The juvenile court also took jurisdiction over J on the bases that father's substance abuse (allegation C) and mother's substance abuse (allegation A) interferes with their ability to safely parent J. Mother admitted to the DHS caseworker that she and father had "relapsed," that they had begun using methamphetamine again around mid-October 2016, and that things had "started to really go downhill for them" in December 2016. Father does not contest that DHS proved that parents used methamphetamine. Rather, father *236 argues that DHS failed to prove any nexus between parents' methamphetamine use and a current threat of serious *63 loss or injury to J that is likely to be realized. We agree with father that DHS's evidence fell short in the latter regard.
"We have recognized on several occasions that a parent's substance abuse alone does not create a risk of harm to a child." E. M. , 264 Or.App. at 83, 331 P.3d 1054. The same is true of a child seeing a parent under the influence of intoxicants. Dept. of Human Services v. D. S. F. , 246 Or.App. 302, 314, 266 P.3d 116 (2011) ("Evidence that a child has been exposed to a parent exhibiting the adverse effects of intoxication is not, in and of itself, a basis for juvenile court jurisdiction over a child."). Rather, DHS must prove that the parent is abusing drugs or alcohol, or exposing a child to drugs or alcohol, "in a way that puts the child at risk of serious harm." Dept. of Human Services v. M. Q. , 253 Or.App. 776, 787, 292 P.3d 616 (2012) ; see also D. S. F. , 246 Or.App. at 313-14, 266 P.3d 116. In Dept. of Human Services v. C. Z. , 236 Or.App. 436, 444, 236 P.3d 791 (2010), we concluded that evidence of illegal marijuana use, without evidence of resulting danger to the children, was insufficient to establish jurisdiction. Similarly, in D. T. C. , 231 Or.App. at 554-55, 219 P.3d 610, we concluded that evidence of father's serious alcohol abuse, of which the children were aware, did not create jurisdiction because of the absence of evidence of resulting danger to the children.
The Supreme Court has firmly rejected "the proposition that any specific condition or circumstance per se does, or does not, establish the juvenile court's jurisdiction." State ex rel. Juv. Dept. v. Smith , 316 Or. 646, 652, 853 P.2d 282 (1993). That rule applies equally to legal intoxicants such as alcohol, more arguably socially acceptable drugs such as marijuana, and illegal drugs such as methamphetamine. See A. W. , 276 Or.App. at 279-80, 367 P.3d 556 (reversing a judgment of jurisdiction based on mother's use of methamphetamine and marijuana because there was no evidence that mother "used drugs while caring for [the child] or that her drug use had any effect on her parenting"). The juvenile court's decision in this case is inconsistent with the principle articulated in Smith . The court explained its assertion of jurisdiction over J based on parents' substance abuse:
*237 "In terms of the substance abuse, methamphetamine is a scourge, and it's the reason that most of our cases come before dependency court. It puts kids in extreme danger. The fact that-just the fact alone that a kid is in a hotel room, when I think about that has, what, a one bedroom essentially living area and a bathroom? And that a kid's in a hotel room where there is $927 in cash, or whatever amount of cash, that there's drugs, that there's safes, that there's a scale, I mean, the fact that is just present with a kid is way enough to show how that interferes . Because that is so unsafe for a child to be around, considering the kind of people that are associated with methamphetamine possession and distribution . It's scary. It is really scary. And it's scary you would put a 5 year old in that situation. And then the fact that they both admitted that they'd relapsed and the fact that being-you know, trying to parent a 5 year old while you're under the influence or coming down from methamphetamine, I don't care if you're doing it in the bathroom, that is unsafe for your child. You're not able to make good decisions. You're not able to have good judgment. You, you know, can stay up for hours or days on end, you can crash for days on end, and you're just not going to meet the needs of your child. So, I do absolutely find that substance abuse impacted and interfered with your ability to safely parent your child."
(Emphases added.)
In so ruling, the juvenile court asserted jurisdiction based on generalizations about a particular "condition or circumstance"-methamphetamine use-rather than relying on evidence of J's specific conditions and circumstances. Smith , 316 Or. at 652, 853 P.2d 282 (prohibiting such approach). In M. Q. , 253 Or.App. at 787, 292 P.3d 616, we reversed a judgment of jurisdiction that relied in part on a DHS caseworker's testimony "that she has not worked with any other parent who has recovered from a methamphetamine addiction without undergoing treatment." As we explained in that case, a *64 "generalized lay observation" about methamphetamine users, which is "not tied to any evidence related specifically to [the particular parent before the court]," is "not enough, standing alone," to establish that a specific child is endangered. Id .
Here, DHS offered no evidence that parents used methamphetamine in J's presence, exposed J to dangerous *238 situations involving methamphetamine, or failed to supervise J due to methamphetamine use. DHS emphasizes the drugs and drug paraphernalia found at the motel on February 4 and the DHS caseworker's suspicion that parents were high at her office on February 6, but J was not present on either of those occasions. As for exposure to dangerous situations, DHS offered no evidence that, other than parents themselves, J was exposed to "the kind of people that are associated with methamphetamine possession and distribution." Nor did DHS offer evidence that parents leave controlled substances or drug paraphernalia where J has access to it and could hurt herself. Indeed, the only evidence was that J had seen parents' bong and knew from parents telling her that they smoked pot, but not that they used methamphetamine, and that parents kept all their "secret stuff" in a lock box or safe to which J did not have access. The juvenile court does not appear to have relied on parents' marijuana use in asserting jurisdiction, and, in any event, "[a]wareness of a parent's substance abuse problems does not, in and of itself, give rise to a risk of serious loss or injury" to a child. D. S. F. , 246 Or.App. at 315, 266 P.3d 116.
Significantly, DHS offered no evidence regarding the circumstances in which parents use methamphetamine as relevant to their ability to parent J. For example, DHS offered no evidence that parents were high "for hours or days on end" while J was in their care, "crash[ed] for days on end" while J was in their care, or did not "meet the needs of" J due to methamphetamine use. Those statements by the court appear to refer to its experience with other methamphetamine users, not evidence regarding these parents. There is no evidence that mother and father were habitually passed out or otherwise left J unsupervised while they used drugs. See D. T. C. , 231 Or.App. at 554, 219 P.3d 610 (stating that, if father had been the only caregiver in the home when he drank himself unconscious, "we would readily conclude that doing so endangered the welfare of the children"). The only evidence that DHS offered on this point was a DHS caseworker's generalized testimony that, "when parents are using substances they often put their addiction issues ahead of the needs of their children" and "[t]heir supervision of their children often is lacking."
*239 Generalizations and assumptions about people who use drugs are insufficient to establish jurisdiction. The only evidence specific to this child is that her parents use methamphetamine. No one would suggest that is desirable parenting behavior. However, the fact of substance abuse alone is insufficient to create jurisdiction under well-established case law. On a more developed record, DHS might have been able to prove that parents' methamphetamine use endangers J. On this record, however, it failed to do so. The juvenile court erred in asserting jurisdiction over J based on parents' substance abuse.
D. Domestic Violence and Substance Abuse Together
At the conclusion of its answering brief, DHS suggests that, even if the evidence is insufficient to establish jurisdiction on any one of the asserted grounds, it is sufficient to establish jurisdiction when viewed together as a whole. We disagree. "DHS is correct that we do not view each allegation in a dependency petition in isolation, but must consider each allegation in connection with any other allegations because sometimes two allegations together present a more compelling case than either one alone." Dept. of Human Services v. G. J. R. , 254 Or.App. 436, 443, 295 P.3d 672 (2013) (emphasis added and internal quotation marks omitted); see also A. L. , 268 Or.App. at 397-98, 342 P.3d 174 (we view the totality of the circumstances). At the same time, the sum is not always greater than the whole of its parts.
In this case, there is no evidence of a material relationship between parents' substance abuse and any domestic violence in *65 their home. For example, DHS offered no evidence that parents fight more in front of J when they are on drugs or that their fights escalate to physical violence when they are on drugs. DHS argues that the allegations are "inextricably intertwined" because the DHS caseworker suspected that parents were on methamphetamine on February 6 when father interrupted mother telling DHS about their illegal drug use, told mother that she needed to shut up, and afterwards appeared to be angry and yelling at mother in the parking lot. We disagree with DHS that it is reasonable to infer a meaningful connection between substance abuse and domestic violence based on a single incident of father *240 getting upset with mother when they may have been under the influence of methamphetamine.
Asserting multiple bases for jurisdiction does not lessen DHS's burden of proof. This is not a case in which two related allegations "present a more compelling case than either one alone," G. J. R. , 254 Or.App. at 443, 295 P.3d 672, or at least not to the degree necessary to create jurisdiction. Whether the allegations are viewed alone or together, the juvenile court erred, on this record, in asserting jurisdiction over J.
Reversed.

Consistent with the withdrawal of allegation E, DHS's arguments on appeal are focused on parents' use of drugs, not any alleged drug dealing. Mother told a police officer at the motel that father occasionally sold methamphetamine, but there is no evidence that he did so from a place where J lived (their "old house" or the motel room) or in J's presence. See State v. Gonzalez-Valenzuela , 358 Or. 451, 472, 365 P.3d 116 (2015) (discussing, in context of child endangerment statute, "the harm a minor experiences from being in a particular place associated with drug activity").

By contrast, in S. T. S. , 236 Or.App. at 646, 238 P.3d 53, on which DHS relies, we concluded that the evidence, albeit "slim," was sufficient to establish a current risk of serious harm to the children where father had repeatedly engaged in physical aggression and violence toward mother, including while she was pregnant; the older child was scared and hid under his bed covers when his father was mean to his mother; and a mental health specialist testified to the risk of injury to a child in a home where physical violence occurs, even if not directed at the child. The evidence in this case was significantly different than the evidence in S. T. S .