AOYAGI, J.
*734 The juvenile court entered a judgment of jurisdiction over K, a 10-year-old girl, *793 based on mother's substance abuse interfering with her ability to safely parent and mother exposing the child to domestic violence. On appeal, mother challenges both bases of jurisdiction. For the reasons that follow, we agree with mother that the record is not legally sufficient to support jurisdiction. Accordingly, we reverse.
On appeal of a jurisdictional judgment, we determine whether, on the record before it, the juvenile court erred in making the statutorily prescribed determination. Dept. of Human Services v. N. P. , 257 Or. App. 633, 639, 307 P.3d 444 (2013). Viewing the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's disposition, we assess whether the record was legally sufficient to permit the outcome. Id . at 639-40, 307 P.3d 444. We state the facts in accordance with our standard of review, along with uncontroverted procedural facts.
Mother has a long history of methamphetamine use, treatment, and relapse, dating back to when she was an adolescent. Mother participated in a treatment program for adolescents with substance abuse problems while she was pregnant with K. According to mother, she remained clean for "quite some time" after engaging in that program, but eventually relapsed for about a year and a half, then was clean for four and a half years, and then relapsed again. Mother's most recent relapse occurred in May 2017. According to mother, she used methamphetamine four times in May 2017, which happened at a friend's house while K was in school; did not use in June or July 2017; and then used twice more in early August 2017, while K was living with both of her grandmothers. Mother says that she feels "agitated" and "not [her] normal bubbly self" when she uses methamphetamine and that the effects usually last for three to five hours.
Mother's domestic partner, W, has lived in the family home since spring 2015. Beginning around November *735 2016, and continuing until at least August 2017, mother and W argued regularly in the home. Sometimes mother and W would start arguing in a common area and then go to their bedroom and lock the door to argue. Approximately three days each week, K would arrive home from school and hear mother and W "yelling" in their bedroom. According to K, she "didn't need to get into it" so she would retreat to her own room about three feet away. K could hear mother "screaming and crying stop and stuff" and W asking "why are you like crying and stuff." K thought that mother probably was telling W to "stop yelling at her" when she said "stop." On "quite a few" occasions, K heard "stuff being knocked over" in the bedroom and thought that it was a glass falling, a telephone falling, or something like that. Sometimes mother would burst out of the bedroom, W would lock the bedroom door behind her, and then mother and W would "be all pushing on the door against each other and stuff."
K was "scared" that mother and W "were going to get hurt" during their arguments, but K never observed any physical violence between mother and W. Mother also denied any physical violence. Mother recalled breaking a cup once during an argument, but she did not throw the cup at W; it just got broken. Asked about whether she felt safe at home, K testified that "the only time I didn't feel like I was safe was when [mother and W] were fighting." K also testified that mother had never hurt her and that she "never thought about" the possibility of W hurting her.
Asked at trial about mother's ability to meet her needs, K testified that mother always met her day-to-day needs.
In mid-June 2017, after the school year ended, mother arranged for K to go on a camping trip with her best friend's family for a week, and then she planned to have K move in with K's grandmothers (who shared a home with K's father) for an unspecified period of time. On the eve of the camping trip, K's best friend, whose parents knew K's parents from Narcotics Anonymous, told K, "I'm sorry your mom's doing drugs." K did not know about mother's recent drug use until then. K moved in with her grandmothers after the camping trip.
*736 On July 31, 2017, the Department of Human Services (DHS) received a "call of *794 concern regarding the father and some concerns about the mother and possible drug use." At that point, father was in jail. A DHS worker, Roeder, interviewed father in jail, tried unsuccessfully to make contact with mother, and interviewed K twice at her grandmothers' house. In her first interview on August 7, K expressed concern that mother was using drugs and said that she did not want to return to mother's home until mother was clean. In her second interview on August 24, K reported to Roeder that mother had telephoned K after the first interview, was upset, and had called K a liar for talking with Roeder about her concerns about drug use. K reiterated her concerns to Roeder and said that she knew that mother "needed help right now."
The next day, August 25, 2017, DHS filed a dependency petition, asserting two allegations as to mother and one allegation as to father. Father admitted to his own substance abuse and stipulated that his substance abuse interfered with his ability to safely parent K. As for mother, DHS alleged that the court had jurisdiction over K because (1) mother's substance abuse interferes with her ability to safely parent the child, and (2) mother exposes the child to domestic violence.
On November 8, 2017, the juvenile court conducted a jurisdictional trial. K testified that she "hates" the fighting between mother and W and that moving out of mother's home in June was a "relief." As for drug use, K testified that she has never seen mother use drugs or seen any drugs in the house. Once she learned of mother's drug use from her friend, however, K would sometimes "think in my head that's why she looks tired and stuff, that's why she's not as funny and laughter-y as she was" before. K "felt" like "the drugs are the reason why" mother had been fighting with W. For her part, mother testified about her drug history and recent drug use, as previously described. She acknowledged that she "should not be using drugs" and that K "deserved" a clean and sober parent. As for her arguments with W, mother testified that they were "just words" but that K had "heard more than I've wanted her to hear." Mother recognized that K is especially sensitive on this issue and tends to shut down *737 "when people start to yell," which mother believes is due to mother having previously been in a relationship with a man who was "very violent" toward mother. Mother attributed her arguments with W to depression and to mother and W both losing their jobs.
At the conclusion of trial, the juvenile court made credibility findings. It found that K's testimony was "quite credible," that K had avoided opportunities to "maximize" her testimony, and that K was "careful about being truthful about what she said." It found that mother's testimony was "not credible." In particular, it expressed concern about mother's "minimization" of her own role in K being out of mother's home. The court then explained why it was asserting jurisdiction:
"[K] did say her needs were being met, but she was afraid, so she said she was getting enough food, she said she had enough clothes, but she said she was afraid. She said that the fighting happened a lot, more often than not. She said two and a half thirds, which I think would be five-sixths, if you do the math with fractions, and then three days out of five she would come home and there's fighting happening in the room, crashing, she didn't say just once, loud yelling over silly things, crashing, pushing against the door, both people, and so I-both Mom and [W]."
The court concluded that the state had proven jurisdiction on both bases asserted in the petition as to mother, as well as the basis stipulated by father.
The juvenile court thereafter entered a judgment of jurisdiction, which mother appeals. In her first assignment of error, mother challenges the court's assertion of jurisdiction based on mother's substance abuse interfering with her ability to safely parent. In her second assignment of error, mother challenges the court's assertion of jurisdiction based on mother exposing K to domestic violence. In her third assignment of error, mother generally challenges the court's assertion of jurisdiction over K.
The juvenile court has jurisdiction over a child whose "condition or circumstances are such as to endanger the [child's]
*795 welfare." ORS 419B.100(1)(c). To establish jurisdiction, DHS must present evidence "sufficient to support a *738 conclusion that the child's condition or circumstances expose the child to a current threat of serious loss or injury that is likely to be realized." Dept. of Human Services v. A. W. , 276 Or. App. 276, 278, 367 P.3d 556 (2016). DHS must establish the "type, degree, and duration" of the harm at issue. Dept. of Human Services v. S. D. I. , 259 Or. App. 116, 121, 312 P.3d 608 (2013). It must establish "a nexus between the allegedly risk-causing conduct and the harm to the child." Dept. of Human Services v. C. J. T. , 258 Or. App. 57, 62, 308 P.3d 307 (2013). The risk of harm must be "nonspeculative"; that is, there must be "a reasonable likelihood that the threat will be realized." Dept. of Human Services v. A. L. , 268 Or. App. 391, 397, 342 P.3d 174 (2015) (internal quotation marks omitted).
Mother argues that there is no evidence that she was using drugs at the time of the jurisdictional hearing on November 8, no evidence that her drug use earlier that year had been more extensive or recent than she admitted, and no evidence that mother's drug use exposed K to a risk of serious loss or injury that was likely to be realized in the absence of jurisdiction. Mother emphasizes that, although she has a long history of drug use, recovery, and relapse, the only evidence of recent drug use was her own testimony that she relapsed and used four times in May 2017, did not use in June or July 2017, and then used twice in August 2017, before getting clean again on August 17, 2017. She also points to the uncontested evidence that K was not in mother's care when mother used in May and August 2017, that K has never seen mother use drugs and only learned of her drug use from a third party, and that mother always meets K's day-to-day needs.
The state responds that the juvenile court found mother's testimony "not credible" generally; notes that mother did not respond to a DHS caseworker's messages about voluntary drug testing; and argues that the court "was not required to find that [mother] was no longer using drugs at the time of trial" because the only evidence that mother had stopped using three months before trial was her own "non-credible testimony." As far as evidence of harm to K from mother's methamphetamine use, the state argues that K was "aware that mother was using drugs" and, on *739 one occasion, heard W accuse mother of selling drugs during an argument. Once she knew about the drug use, K also began to attribute aspects of her mother's behavior to potential drug use, such as her mother looking tired or not being as "funny and laughter-y" as in the past.
The parties' arguments raise the question what the state must do to establish a parent's ongoing substance abuse at the time of a jurisdictional hearing.[1] We need not reach that question, however, because we find another issue dispositive. Specifically, we agree with mother that, regardless of the precise extent and timing of her drug use, there is no evidence in this record that it created a "condition or circumstances" that endangered K's welfare within the meaning of ORS 419B.100(1)(c).
K is understandably troubled by her mother's drug use. However, the state may not insert itself into a family and remove a child anytime that a parent uses drugs. Under ORS 419B.100(1)(c), the juvenile court may assert jurisdiction only where the evidence is sufficient to establish "a current threat of serious loss or injury that is likely to be realized." A. W. , 276 Or. App. at 278, 367 P.3d 556. Here, DHS acknowledges that there is no evidence that mother failed to provide adequate care to K due to drug use. The only harm that DHS has identified as resulting from mother's recent drug use is *796 that K was "aware" of it (due to a comment by a third party) and, as a result, wondered at times whether that was why mother looked "tired" or did not laugh as much as she used to.
We have repeatedly recognized that a parent's substance abuse alone is not sufficient to assert jurisdiction, even when a child is aware of it. Dept. of Human Services v. J. J. B. , 291 Or. App. 226, 236, 418 P.3d 56 (2018) (discussing *740 case law and reversing jurisdictional judgment based on parents' methamphetamine use due to lack of evidence of current threat of serious loss or injury); see also, e.g. , A. W. , 276 Or. App. at 279-80, 367 P.3d 556 (reversing jurisdictional judgment based on mother's use of methamphetamine and marijuana due to lack of evidence that mother "used drugs while caring for [the child] or that her drug use had any effect on her parenting"); Dept. of Human Services v. D. S. F. , 246 Or. App. 302, 314, 266 P.3d 116 (2011) ("Evidence that a child has been exposed to a parent exhibiting the adverse effects of intoxication is not, in and of itself, a basis for juvenile court jurisdiction over a child."); Dept. of Human Services v. D. T. C. , 231 Or. App. 544, 554-55, 219 P.3d 610 (2009) (evidence of father's serious alcohol abuse, of which the children were aware, did not create jurisdiction because of the absence of evidence of resulting danger to the children). On this record, the evidence was insufficient to assert jurisdiction over K based on mother's substance abuse.
We turn then to the other basis on which the juvenile court asserted jurisdiction-that mother exposes the child to domestic violence. Mother argues that DHS failed to articulate, let alone establish, a specific type, degree, and duration of harm to K from exposure to mother and W's arguments. In particular, she argues that DHS failed to establish that the arguments exposed K to a current threat of serious loss or injury that was likely to be realized in the absence of jurisdiction.
DHS responds that the evidence was sufficient to establish jurisdiction because of the frequency and severity of mother and W's arguments, including evidence that the arguments sometimes started in common areas before moving behind closed doors, that K sometimes heard objects get knocked or fall over inside mother and W's bedroom, and that mother and W sometimes pushed on opposite sides of the bedroom door when W locked mother out of the bedroom after an argument. On one occasion, mother told W that K would call the police if he came near them, but K did not know how to call the police and, when she asked mother, mother told her not to call the police. On another occasion, to avoid continued arguing with W, mother left the house and took K to a motel for one night.
*741 DHS emphasizes K's testimony that, even though she never saw any physical violence, she "hated" mother and W's arguments, was "scared" that mother and W "were going to get hurt," did not feel "safe" when mother and W argued, and was relieved to go live with her grandmothers and get away from the arguments. Finally, DHS points to mother's own testimony that she thinks that fighting "absolutely" harms a child, even when it is not physical, and that she has noticed in the past that K "kind of shuts down" when people yell, at her or around her, which mother thinks is due to mother having been abused by a "very violent" man in a previous relationship.
Given the frequency and intensity of mother and W's arguments, the relatively prolonged time period over which they had been occurring, and the evidence that the arguments did have some emotional impact on K, this is a close case. Ultimately, however, we conclude that the evidence was insufficient to establish a current threat of "serious loss or injury" that was likely to be realized. A. W. , 276 Or. App. at 278, 367 P.3d 556. There is no evidence that K was at risk of physical injury in mother's home, either directly or indirectly, as a result of mother and W's arguments. That distinguishes this case from Dept. of Human Services v. C. M. , 284 Or. App. 521, 529, 392 P.3d 820 (2017) (child was at risk of physical injury "by the events immediately surrounding him even though he was not physically harmed or even aware of those events"), and State v. S. T. S. , 236 Or. App. 646, 656 n. 1, 238 P.3d 53 (2010) (father had long history of physical violence toward *797 mother, and mental health specialist testified to the risk of physical injury to a child in a home where physical violence occurs, even if not directed at the child).[2]
Here, the alleged risk of harm to K was emotional or psychological. We do not discount the possibility that, even in the absence of physical violence, exposure to frequent and severe verbal altercations between parents or other adults in a child's home may, in some circumstances, give rise to a threat of "serious loss or injury" in the form of *742 serious emotional or psychological harm to a child. In order to establish such a circumstance, however, DHS must offer evidence, not only argument or conclusory statements.
In Dept. of Human Services v. K. C. F. , 282 Or. App. 12, 20, 383 P.3d 931 (2016), we reversed a jurisdictional judgment based in part on the father's emotional abuse of the mother because,
"although there is evidence that father has been emotionally abusive of mother and that the parents' conflict has affected the children, apart from [the caseworker's] description of the general effect that domestic abuse can have on a child, there is no evidence of a present risk of serious harm that is reasonably likely to occur."
Similarly, in A. W. , 276 Or. App. 276, 367 P.3d 556, we reversed a jurisdictional judgment based in part on domestic violence because "there was no evidence that A had witnessed any physical violence, and, even if A had seen or heard disagreements between his parents or between his parents and grandfather, DHS did not present evidence that such exposure put A at risk of serious harm or injury."
Our decisions in S. D. I. , 259 Or. App. at 117, 312 P.3d 608 and Dept. of Human Services v. M. E. , 255 Or. App. 296, 297 P.3d 17 (2013), are also instructive. In S. D. I. , we concluded that, even if the juvenile court had properly admitted a DHS caseworker's testimony that the child A was likely to be "psychologically damaged" by immediate transfer to her mother's care after years without contact with her, and even if there was evidence to support the court's finding that the mother would transfer A in a manner that would "create a risk of psychological or emotional adverse impact" to A, the state had "failed to establish that such a transfer would give rise to a risk of serious loss or injury to A." 259 Or. App. at 121, 312 P.3d 608 (emphasis added). "In other words, the state failed to establish that the severity of the potential harm was such that juvenile court jurisdiction was justified." Id . We therefore reversed the jurisdictional judgment. Id . at 123-24, 312 P.3d 608. In M. E. , we also reversed a jurisdictional judgment because the evidence was insufficient to establish that a child was at risk of "serious loss or injury." 255 Or. App. at 313, 297 P.3d 17. In that case, the juvenile court asserted jurisdiction in part based on the *743 mother making "negative comments" to the child, which allegedly harmed the child's "emotional and physical well-being," but the state failed to present any evidence "as to the nature of the physical or emotional injury that [the child] was reasonably likely to suffer because of mother's negative comments." Id.
We conclude that, on this record, DHS failed as a matter of law to establish that mother and W's arguments exposed K to a current threat of "serious loss or injury." A. W. , 276 Or. App. at 278, 367 P.3d 556. The juvenile court therefore erred in asserting jurisdiction over K on the basis that mother exposes K to domestic violence.
Finally, in addition to considering the alleged bases for jurisdiction separately, we must consider "whether the allegations in the petition are collectively sufficient, if proven, to establish jurisdiction." M. E. , 255 Or. App. at 313, 297 P.3d 17 (emphasis added; citation omitted). "[W]e do not view each allegation in a dependency petition in isolation, but must consider each allegation in connection with any other allegations because sometimes two allegations together present a more compelling case than either one alone." Dept. of Human Services v. G. J. R. , 254 Or. App. 436, 443, 295 P.3d 672 (2013) (emphasis *798 added; internal quotation marks omitted). In other words, the ultimate question is whether, on the record before the court, there was evidence that "the totality of the children's circumstances or conditions exposed them to a current risk of serious loss or injury that was reasonably likely to be realized." A. L. , 268 Or. App. at 397-98, 342 P.3d 174 (emphasis added).
In this case, viewing the two alleged bases for jurisdiction together does not make "a more compelling case for jurisdiction," G. J. R. , 254 Or. App. at 443, 295 P.3d 672, such as by revealing a heightened risk of serious loss or injury arising from the combined effect of the two jurisdictional bases. The only evidence of any relationship between the two jurisdictional bases is K's testimony that, since learning of mother's relapse, K believes that "mother's drug use is the reason that mother fights with [W]." K no doubt believes that connection exists, just as she understandably thinks that mother might be using drugs every time that mother looks tired or laughs less than usual. A 10-year-old child's belief about possible *744 reasons as to why her mother argues with her domestic partner, however, is not enough to establish that mother's drug use heightens the risk to K from exposure to mother and W's arguments. This is not a case where one jurisdictional basis feeds another.[3] Whether the jurisdictional allegations are viewed separately or together, the evidence in this record was insufficient to support the assertion of jurisdiction. Accordingly, we reverse and remand the judgment of jurisdiction.
Reversed.

See Dept. of Human Services v. K. V. , 276 Or. App. 782, 794, 369 P.3d 1231, rev den , 359 Or. 667, 379 P.3d 523 (2016) (recognizing that the juvenile court was not required to believe father's unsubstantiated claim regarding an assessment that he did not need substance abuse treatment, but also emphasizing the existence of other, affirmative evidence to support the court's finding that father was still abusing alcohol at the time of the jurisdictional trial); Dept. of Human Services v. M. Q. , 253 Or. App. 776, 786, 292 P.3d 616 (2012) (neither father's nonsubmission to voluntary urine testing, nor the "the juvenile court's apparent disbelief of father's claimed sobriety," constituted "affirmative evidence that [father] still was using drugs at the time of the [jurisidictional] hearing").

We note that S. T. S. also was a close case. There, we concluded that the evidence was "slim" but sufficient to establish a current risk of serious harm. 236 Or. App. 646, 238 P.3d 53. Here, the case falls on the other side of the jurisdictional line.

Compare J. J. B. , 291 Or. App. at 236, 418 P.3d 56 ("no evidence of a material relationship" between the substance abuse allegation and the domestic violence allegation), with State ex rel. Juv. Dept. v. N. W. , 232 Or. App. 101, 109, 221 P.3d 174 (2009) (two allegations were more compelling together because "the presence of untreated sex offenders in combination with [mother's] use of controlled substances synergistically creates a whole that is more dangerous than the sum of its parts").