No. 292 April 8, 2026 437

IN THE COURT OF APPEALS OF THE
STATE OF OREGON

In the Matter of P. A. S.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

T. C. S.,
*Appellant.*

Linn County Circuit Court
24JU06054; A187630

Heidi M. Sternhagen, Judge pro tempore.

Argued and submitted December 17, 2025.

Sean Connor, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Oregon Public Defense Commission.

Jose B. Garcia-Fuerte, Assistant Attorney General, argued the cause for respondent. Also on the brief were Dan Rayfield, Attorney General, and Benjamin Gutman, Interim Deputy Attorney General.

Before Ortega, Presiding Judge, Joyce, Judge, and Hellman, Judge.

HELLMAN, J.

Affirmed.

**HELLMAN, J.**

In this juvenile dependency case, father appeals a judgment asserting dependency jurisdiction over his child, P, who was four months old at the time of the jurisdictional trial. In two assignments of error, he challenges the juvenile court's ruling to assert dependency jurisdiction over P on the basis that his substance abuse impairs his ability to safely parent. In particular, father argues that the evidence was insufficient to prove that a nexus existed between father's methamphetamine use and a cognizable risk of harm to P, and therefore, he contends that the juvenile court impermissibly asserted jurisdiction solely on the basis of father's substance abuse.

We conclude that the evidence was sufficient to establish the requisite nexus. Specifically, the record shows that P requires a high level of care and near constant monitoring as a result of exposure to methamphetamine in utero, and father's ongoing and untreated substance abuse impairs his ability to provide her with the level of care and stability she requires. We therefore affirm.

Neither of the parties requests *de novo* review, and we decline to exercise our discretion to conduct such review in this case. *See* ORAP 5.40(8)(c) (providing that we may exercise our discretion to conduct *de novo* review "only in exceptional cases"). Accordingly, "[w]e view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the juvenile court's disposition and assess whether, when so viewed, the record was legally sufficient to permit the outcome." *Dept. of Human Services v. T. L. H. S.*, 292 Or App 708, 709, 425 P3d 775 (2018). We state the facts in accordance with that standard.

Mother and father met in August 2022 and began a relationship that continued roughly until the birth of their daughter, P, in December 2024. They used methamphetamine together "[o]n and off" throughout the course of their relationship. When mother became pregnant, she did not initially tell father because of her ongoing drug use, and father only became aware of the pregnancy in November 2024, when

mother was eight months pregnant. Their relationship went "downhill" at that point, and father questioned whether he was in fact the child's biological father, although he understood that the child would have his last name.

P was born on December 8, 2024. She tested positive for methamphetamine at birth and was placed in the neonatal intensive care unit due to breathing complications resulting from methamphetamine exposure. The Oregon Department of Human Services (ODHS) became involved, and a caseworker contacted father to discuss their concerns about P. Father stated that he wanted to take a paternity test before moving forward.

On December 13, mother and P were released from the hospital and entered a drug treatment facility together. Shortly thereafter, ODHS removed P from mother's care and placed P into substitute care. ODHS then filed a petition with the juvenile court to take dependency jurisdiction of P on the basis that mother's substance abuse impairs her ability to safely parent P. Father was not named in the initial petition because his parentage had not yet been established.

Father has a long history of drug use spanning roughly twenty years, and he has reported that he uses approximately three to four grams of methamphetamine on a daily basis to manage physical pain. Shortly after P's birth, father began seeking drug treatment to "better [himself] and [his] situation." On December 11, 2024, he went to Samaritan Treatment and Recovery Services (STARS) for treatment and reported that his last use was that same day. He explained that he had "got caught up in a repeating pattern [of] always making excuses" and that "without help he [would] not improve." Father was unsure that he would be able to maintain sobriety and told staff, "If I want to use I will use." Father was diagnosed with "severe" methamphetamine use disorder and was approved for residential treatment, but a bed was not immediately available. He declined outpatient services in the interim. Father entered the STARS residential treatment program later that month, on December 30, 2024, and reported his last use as that same day. However, just five days later, father withdrew, contrary to the advice of his treatment team and ODHS, because he

felt that he had spent sufficient time in treatment and he wanted to look for employment.

In late February, ODHS received the results of the paternity test, which confirmed father to be P's biological parent. When the caseworker informed father, he asked "when he could come and get [P]," at which point the caseworker set up a meeting with father to discuss the "legal process." At that meeting, father disclosed that he had used methamphetamine the week prior.

After father's paternity was confirmed, ODHS amended the dependency petition to add jurisdictional allegations against father, in particular (1) that his substance abuse impairs his ability to safely parent P, (2) that his residential instability and chaotic lifestyle interfered with his ability to safely parent P, and (3) that father did not understand P's basic needs and lacked the parenting skills necessary to safely parent her.[1]

In mid-March, ODHS began facilitating weekly supervised visits between father and P. ODHS required father to confirm with the caseworker the morning of each visit that he would be in attendance. By the start of the jurisdictional trial, father had attended only one of four scheduled visits, which he cut short to attend a job interview. On two occasions, he did not make any contact with the caseworker before the scheduled visit, even though the caseworker had provided him with a phone and phonecard to help father communicate about visits. After failing to call in for one visit, father told the caseworker that he had not tried to activate the phone. On another occasion, he called and confirmed that he would attend the visit but then failed to show up. During the visit father attended, he was attentive—he fed P a bottle, changed her diaper with assistance from the caseworker, and held and interacted with her in a developmentally appropriate way.

Other caseworkers worked with father to identify shelter options and suggested several sober living

---

[1] The amended petition also contained a fourth allegation that father lacked a custody order and was therefore unable to protect P from mother's neglectful behavior. At the beginning of the jurisdictional trial, ODHS moved to dismiss that allegation.

arrangements. A caseworker dropped father off at a sober living house, which required residents to submit to urinalysis tests in order to obtain a bed. Father ended up leaving without staying the night, explaining that "a fight broke out and [he] wouldn't have no part of that." Father did not take any action to pursue other options.

Just a few weeks before the jurisdictional trial, father used an acquaintance's vape that contained methamphetamine, although father claimed that he was unaware that the vape contained substances other than nicotine and that he did not know the acquaintance to be a drug user.

Because of P's exposure to methamphetamine, she has special needs and requires around-the-clock care and monitoring. In particular, P's breathing issues have persisted, and she intermittently stops breathing throughout the day and night. Her resource parent uses an "Owlet" sock to monitor P's pulse and blood oxygen level, and the device alerts the resource parent if P stops breathing or her oxygen levels are too low. Because of those breathing issues, P makes a "choking sound" when she sleeps and requires "pretty frequent checks on her throughout the night." P also has "sensory issues" and is particularly sensitive to light and noise. She requires an environment that is "low sensory" and free of smoke, fragrances, or anything else that could "congest her and make her breathing worse." P is "incredibly fussy" and struggles with feeding because of problems with swallowing. As a result, she follows a strict daily routine, and if her schedule is disrupted for "any reason," she will not sleep or eat and "she'll want to be held all the time."

The jurisdictional trial began in April when P was four months old. Mother admitted to the jurisdictional allegations against her.[2] At the time of trial, father did not have stable housing, and he was "couch surfing," which he acknowledged made it difficult to "have like a solid \*\*\* schedule." Father's adult son testified that he was willing to allow father and P to live with him, his partner, and their three minor children. Father had spent time with those children, and his son testified that he was "completely good"

---

[2] Mother is not a party to this appeal.

around them and enjoyed spending time with them and playing games.

At the conclusion of the trial, the juvenile court dismissed the allegations pertaining to father's residential instability, chaotic lifestyle, and lack of parenting skills. The juvenile court explained that although father has a "history of residential instability and his lifestyle has been chaotic[,] *** he does present a plan today that would indicate a pretty stable environment ***." However, the juvenile court concluded that the state had met its burden as to the allegation concerning father's substance abuse. Specifically, the juvenile court determined that:

"So that leaves paragraph 4C, 'The father's substance abuse impairs his ability to safely parent the child placing the child at risk of harm.' Father, by his own admissions, indicated that he used methamphetamine. To the treatment program and to ODHS he indicated that he would use between two and three grams and today he testified, you know, that the use would be within a couple of days, I think at some points and he indicated every day, but certainly when he used it was fairly regularly.

"Father felt enough that he needed a treatment program that he did go into residential. He wanted to do that because he knew that—I can't remember exactly what the word that he used—but it was certainly was not going to be a good situation for [P], the fact that there was homelessness, drug use, and so he went into a residential program. Father left that program after five days and since then he is certainly—he talked with—he was referred to an outreach worker and indicated what he—well, first of all, he indicated why he left the program was to get a job and yet there was nothing that indicated he got a job other than a one-day job at Duffy's.

"I agree with [child's counsel] that the Court can use common sense and reason if a person is using controlled substances, they are not necessarily doing the other things that might be—that they would be doing otherwise, including looking for a place to live, looking for a job.

"He admitted that he had used—when he met with [ODHS] in February, he admitted that he had used just the week prior. So it wasn't just, as argued by his attorney, that

one time that he admitted in, like, April 1st or late March, but there was also an admission to February. But then he also admitted that he had used a vape pen. He made the statement that he didn't—you know, he wasn't planning on doing it. So what that tells me is he is still hanging out with associates and people that are using and it just doesn't make sense to me that he's using some vape of somebody he doesn't really know—first of all, he's just using this vape and he doesn't know enough that they're using controlled substances. That testimony to me was very unbelievable.

"Also, one of the things that he indicated what he really wanted help with was from the outreach worker * * * was that he wanted help with housing, and yet when he had an opportunity to have a place to stay in a shelter, he walked away from that. And I don't believe the statements that because it was crowded or that there were fights, it is much more indicative of somebody who doesn't want to take a [urinalysis test] and that's why they would walk away. And so I just don't believe some of his testimony regarding that.

"I certainly think Father has some, based on a prior employment and his MMA fighting, he may have some memory issues, but I believe that a number of his statements are really based on trying to avoid acknowledging that he has a drug problem. So he has avoided doing the things that would be appropriate to maintain sobriety, and to properly and safely parent [P], including providing a safe home, being able to provide his own care for her. And so I do find that a nexus has been shown on that."

Following the hearing, the juvenile court entered the judgment asserting jurisdiction over P based on father's substance abuse. This appeal followed.

Under ORS 419B.100(1)(c), a juvenile court may assert dependency jurisdiction over a child whose "condition or circumstances are such as to endanger the [child's] welfare." To establish that a child is endangered, ODHS "must present evidence sufficient to support a conclusion that the child's condition or circumstances expose the child to a current threat of serious loss or injury that is likely to be realized[,]" and it must establish the "type, degree, and duration" of the injury at issue. *Dept. of Human Services v. J. J. B.*, 291 Or App 226, 230, 418 P3d 56 (2018) (internal quotation marks omitted). ODHS must also prove "a nexus

between the allegedly risk-causing conduct and the harm to the child." *Dept. of Human Services v. C. J. T.*, 258 Or App 57, 62, 308 P3d 307 (2013). Thus, the "key inquiry in determining whether conditions or circumstances warrant jurisdiction is whether, under the totality of the circumstances, there is a reasonable likelihood of harm to the welfare of the child." *Dept. of Human Services v. E. M.*, 264 Or App 76, 81, 331 P3d 1054 (2014) (internal quotation marks and brackets omitted).

No specific condition or circumstance *per se* establishes that a juvenile court has jurisdiction over a child. *State ex rel Juv. Dept. v. Smith*, 316 Or 646, 652-53, 853 P2d 282 (1993). For that reason, the fact of a parent's substance abuse is insufficient on its own to establish jurisdiction. *E. M.*, 264 Or App at 83. Additionally, the juvenile court may not take jurisdiction over a child based on assumptions or generalities about circumstances attendant to substance abuse. *J. J. B.*, 291 Or App at 239. Instead, ODHS must present "relevant individualized evidence about [the parent's] current circumstances." *Dept. of Human Services v. M. Q.*, 253 Or App 776, 787, 292 P3d 616 (2012). That evidence must demonstrate that, in the specific case, the parent's substance abuse subjects the child to a nonspeculative threat of serious loss or injury. *E. M.*, 264 Or App at 83.

That does not mean, however, that testimony (expert or otherwise) is required as to every aspect of a parent's substance abuse. A juvenile court sitting as a factfinder is permitted to "rely on common knowledge much the same way a juror could." *Dept. of Human Services v. T. M.*, 338 Or App 725, 728, 566 P3d 707, *rev den*, 373 Or 815 (2025). For example, in *T. M.*, we rejected the mother's argument that ODHS had failed to present evidence about the dangers of fentanyl, explaining that the court could rely on common knowledge that methamphetamine laced with fentanyl could incapacitate the user. *Id.* We upheld the juvenile court's ruling to assert dependency jurisdiction because ODHS presented evidence specific to the child regarding the circumstances that resulted from the mother's drug use and which endangered the child: the mother would drive with her child in the car while under the influence. *Id.* at 728-29. Taken together,

we concluded that the evidence was sufficient to establish a nonspeculative risk of harm to the child. *Id.* at 729.

Here, ODHS was required to prove by a preponderance of the evidence that father's methamphetamine use created a current threat of serious loss or injury to P's welfare. To that end, ODHS offered evidence that father has been using methamphetamine for roughly two decades and that his addiction remains untreated. Although father has sought treatment on several occasions since P's birth, he declined outpatient services and withdrew from residential treatment after only five days, against the advice of his providers who believe that in order to maintain sobriety, father requires residential treatment in a highly structured setting. In its ruling, the juvenile court emphasized that father had not taken the steps necessary to maintain his sobriety or to "properly and safely parent" P, such as by providing a safe home.

Father emphasizes that the juvenile court ultimately dismissed the allegations concerning father's residential instability and chaotic lifestyle. But even if the juvenile court declined to assert jurisdiction on those bases, the court was still permitted to consider father's struggles to find housing and otherwise maintain stability as part of the totality of the circumstances. *Dept. of Human Services v. W. A. C.*, 263 Or App 382, 394, 328 P3d 769 (2014) (explaining that a juvenile court is required "to consider all of the facts in the case before it and to consider whether, under the totality of the circumstances, the child's welfare is endangered").

As the juvenile court found, since P's birth, father has struggled to achieve stability. His long-term addiction remains untreated. He does not follow through on his stated commitments to maintaining sobriety and obtaining housing. Instead, he continues to use methamphetamine and associate with individuals who are using, and he has turned down housing that required him to pass a urinalysis test.[3]

---

[3] Although father testified that he declined the housing for other reasons and that he was unaware that the vape pen contained methamphetamine, the juvenile court found that testimony not credible, which we do not second guess. *See Dept. of Human Services v. D. J. L.*, 345 Or App 474, 481, 582 P3d 690 (2025)

He also has not followed through on his commitments to P, namely, to visit her during scheduled visits.

The record further demonstrates that P requires stability in the forms of a high level of care, strict adherence to routine and structure, and near constant monitoring and supervision. In light of P's need for stability and the instability resulting from father's substance abuse, the evidence permitted the juvenile court to conclude that ODHS had proved a nexus between father's substance abuse and harm to P. For that reason, this is not a case in which the juvenile court asserted jurisdiction solely on the basis of father's substance abuse, nor a case in which the juvenile court filled in an evidentiary gap by relying on generalizations about substance abuse. Rather, the juvenile court concluded, based on P's specific needs, that father's persistent drug use creates instability and leads to an inability to provide P with the stability she requires. We therefore conclude that the evidence was sufficient to establish a current and nonspeculative risk of harm to P, and the juvenile court did not err in asserting jurisdiction over P on the basis of father's substance abuse.

Affirmed.

---

(explaining that a juvenile court's credibility determinations "are entitled to deference" if supported by any evidence in the record).