HADLOCK, J.
*90 In this juvenile dependency case, mother appeals two separate judgments in which the juvenile court asserted jurisdiction over mother's two young children on the ground that mother's mental health condition interferes with her ability to safely parent. The court entered those judgments in May 2017 having previously taken jurisdiction in 2015 on the ground that mother had assaulted the father of one of the children. On appeal, mother contends that the record does not include evidence sufficient to establish that her mental health condition creates a current threat of serious loss or injury to the children that is reasonably likely to be realized. See Dept. of Human Services v. S. P. , 249 Or.App. 76, 84, 275 P.3d 979 (2012). In response, the Department of Human Services (DHS) argues that the juvenile court's determination that the children were at risk is adequately supported by evidence showing that mother's mental health condition impeded her ability to resolve the issues identified in the 2015 judgment. We agree with mother and, therefore, reverse.
Mother has not requested that we exercise our discretion to review de novo , ORS 19.415(3)(b), and, in any event, this is not a case in which we would conclude that de novo review is appropriate. See ORAP 5.40(8)(c) (we exercise de novo review "only in exceptional cases"). Accordingly, in reviewing the juvenile court's judgments, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." Dept. of Human Services v. N. P. , 257 Or.App. 633, 639, 307 P.3d 444 (2013). We are bound by the juvenile court's explicit and necessarily implied findings of historical fact as long as any evidence supports them. Id. at 639-40, 307 P.3d 444. We state the facts consistently with those standards.
Mother sometimes was in foster care when she was a teenager, although the record includes few details regarding the reasons why mother was removed from the home of her own mother (grandmother).[1] A psychological evaluation *91 performed in 2012, when mother was 17 years old, indicated that mother's cognitive functioning was significantly below *558 average. She also was diagnosed with depressive disorder and a reactive attachment disorder, which the psychologist described as reflecting "a real difficulty making connections with people emotionally," making conflicts and disruptions in relationships more likely. Mother had significant anger-management difficulties.
One of mother's children was born in 2014 and the other was born in May 2015. DHS filed dependency petitions for both children in August 2015, after mother assaulted her then-boyfriend, LS, who is the father of one of the children. The 2015 jurisdictional petitions and judgments are not in the record of this case.[2] However, we judicially notice that, in August 2015, DHS petitioned for jurisdiction on three grounds: (1) mother's mental health interfered with her ability to safely parent; (2) mother committed domestic violence against LS, in the presence of a child or children; and (3) "mother's criminal behaviors interfere with her ability to safely parent[.]" See OEC 201(f) ("Judicial notice may be taken at any stage of the proceeding."); Dept. of Human Services v. S. R. H. , 278 Or.App. 427, 442 n. 17, 381 P.3d 1059, rev. den. , 360 Or. 422, 383 P.3d 854 (2016) (taking judicial notice of a permanency judgment entered during the pendency of an appeal from other judgments involving the same children). The children were removed from mother's care and soon were placed in relative foster care.[3]
In September 2015, mother was convicted of misdemeanor fourth-degree assault against LS. Mother admitted that conviction in response to the 2015 dependency petitions and further admitted that she needed the assistance of DHS
*92 and the court "to resolve the safety risk" to the children. The juvenile court found the children to be within its jurisdiction solely on the basis of those admissions, apparently in association with the allegation relating to mother's "criminal behaviors." The "safety risk" to the children was not further identified either in mother's admissions or in the jurisdictional judgments. The court dismissed the other jurisdictional allegations, namely, those related to domestic violence and to mother's mental health. The court required mother to complete domestic violence counseling, demonstrate "a violence-free lifestyle," and complete a comprehensive psychological evaluation and any recommended treatment.
Mother testified at the hearing on the 2017 petitions that, although she now recognizes that she was verbally abusive to LS in 2015, there had been only one incident of physical abuse between them. She described that as occurring after they got in an argument, he started throwing chairs around, and she slapped him. Mother testified that no children were present during the argument, which occurred "at the bottom end" of an 11-acre property, although her two children were in the house. Mother acknowledged that other, unidentified, children would have heard the yelling. She also acknowledged that it is bad for children to witness domestic violence.
In accordance with the 2015 jurisdictional judgments, mother received another comprehensive psychological evaluation; it was performed by the same psychologist who had evaluated her in 2012. Because DHS relied heavily on the resulting report, we discuss it in some detail. The 2015 report includes background information that the psychologist received from DHS, which indicates that some children had been nearby during mother's altercation with LS, but that mother's children "were not directly present." The report further states, in the section based on information received from DHS, that LS reported that mother had assaulted him previously. Mother denied any previous physical altercations.
During the 2015 evaluation, mother acknowledged having struggled with anger, noting that she had yelled, slammed doors, and thrown objects during arguments.
*93 However, she disagreed with other people's *559 reports of the level of her anger. The psychologist reported a lack of clarity about the severity of mother's angry outbursts, noting that other individuals' reports of mother's aggressiveness conflicted with her self-reports. The psychologist also noted that "there is no significant history of aggressiveness in the past, while she lived in foster care" and that-other than being resistant to authority figures-mother had not displayed any serious behavior problems.
The psychologist again diagnosed mother with depressive disorder and a persistent reactive attachment disorder, noting that the latter diagnosis "is merely a summary statement describing her distrust of others generally and her limited ability to feel emotionally connected or empathetic towards others." He also reported that mother has a stable mild intellectual disability. However, mother's cognitive limitations are not overwhelming and do not suggest an inability to learn.
During her evaluation, mother reported finding counseling helpful in learning strategies to calm down, and the psychologist found mother's willingness to engage in that service and accept new ideas to be "very encouraging." The psychologist also reported that mother has resilience, fortitude, and strong parenting knowledge; she also indicated caring for her children. A remaining question was whether mother's "anger would be visited upon the children during periods of frustration." However, mother was not identified as, "nor did she display characteristics of somebody who was inclined to be abusive or hurtful to [children] herself directly." The psychologist's concerns were "more about the degree of potential danger that might come from what other people would do around her, to her with her kids."
That potential danger arises, according to the psychologist, because the combination of mother's reactive attachment disorder and cognitive limitations likely would adversely affect "her ability to look at situations and be able to evaluate which do and do not present a safety threat" to her children. Thus, the psychologist reported, the "biggest danger" may arise "from whomever [mother] involves in her life," as "romantic partners may present a cause of concern *94 for her children, just as they may add to the risk of emotional outbursts for [mother]; she offered little by way [of] strategies for avoiding negative entanglements." Because of that, "[s]ignificant risk is indicated" and the psychologist recommended continued child-welfare intervention and therapy.
DHS did continue working with the family after the psychological evaluation was completed. Case worker McKittrick, who had the family's case from August 2015 to January 2016, described her safety concerns as involving "mother's violent behavior and impulsivity." McKittrick also expressed concern that mother exposed the children to unsafe people and conditions, specifically grandmother, with whom she was living.
In September 2015, mother became romantically involved with a man, CV. DHS initially approved CV as a person who could spend time around the children.
DHS caseworker Marvin-Thomas has had the family's case since January 2016. At that point, mother had taken parenting classes and the reports were good to excellent. In March 2016, mother started participating in a batterer's intervention program, which she completed a year later.
In May 2016, mother told Marvin-Thomas that CV had hit her, causing bruising, and mother reported that he was no longer living in her home. However, mother acknowledged in July 2016 that she had remained in a relationship with CV after he hit her because she needed help in paying her bills. In July, mother told Marvin-Thomas that "she was done with him again for sure that time."
During 2016, mother had extensive visitation with the children, seeing them for four hours each evening during the week, at the foster parents' home, and eventually also having unsupervised visitation in the community for two to three hours at a time. DHS attempted a trial reunification in November 2016; the children started to spend longer periods of time-up to four days a week-with mother at her apartment. Mother was capable of meeting her children's needs and was doing so for the most part. Marvin-Thomas instructed mother that anyone who was going to babysit the children needed to *560 be approved through DHS, and *95 DHS approved a specific babysitter. In addition, although Marvin-Thomas had told mother that the children should not be around grandmother, Marvin-Thomas understood that might be unreasonable if the children were returned to mother's care. Accordingly, Marvin-Thomas told mother that, as long as mother was present when the children were with grandmother, "it was okay."
Marvin-Thomas paid an unscheduled visit to mother's apartment in December 2016. She could hear people inside, but nobody answered even though she knocked for about 15 minutes. Marvin-Thomas called the police, who came to the apartment. Finally, after officers threatened to break it down, grandmother, who was watching the children while mother was at work, opened the door. Marvin-Thomas removed the children from mother's home based on that incident and other concerns that had arisen during the case, although the children had "appeared fine" in grandmother's care. The children have been in foster care since then. DHS filed the new petitions alleging additional grounds for jurisdiction in February 2017.
After the December 2016 incident in which the police were called to mother's apartment, mother and CV reunited. At that point, mother testified, the relationship was good; they had set up couple's therapy and he was attending a weekly program to help him cope with his anger. Mother did not tell DHS that she and CV were in a relationship again; she testified at the 2017 jurisdictional hearing that she "did not feel the need to because DHS had taken [the] kids." Nor did mother tell her domestic-violence treatment providers that she had renewed a relationship with a man who had been physically violent toward her; she testified that she had not done so because she "was in that class for the domestic violence of" LS. Mother described the batterers' intervention program as having taught her better coping and communication skills, and how to "take a step back and hold [her] tongue" during an argument, getting all her thoughts and emotions together, so she could talk calmly and respectfully with her partner.
In March 2017, CV assaulted mother and he was arrested. Mother did not tell her treatment providers about *96 that incident because she felt she had applied the coping skills that she had learned (she did not fight back), and she had no control over what CV did. Mother did tell Marvin-Thomas that she had subsequently obtained a no-contact order against CV and was getting a restraining order. Mother has not had any in-person contact with CV since that assault; she did speak with him while he was in jail and he told her that he was supposed to be deported.
The jurisdictional hearing took place in April 2017. Marvin-Thomas testified that she was concerned for the children's safety because "throughout the case there is consistent repeated choices of unsafe people," meaning CV and grandmother. Marvin-Thomas acknowledged that the children had not been present during either of the violent incidents with CV. Nonetheless, she described the safety concern as being that "if mother had the children and [was] with [CV] that the children could be witness to additional domestic violence because it is an ongoing relationship that violence has been proven to be there." Marvin-Thomas believes that mother "would be in a relationship with [CV] tomorrow" if DHS were not involved. In addition, with respect to the incident with grandmother, Marvin-Thomas testified that mother "made a choice to have a person who was never to be alone with the children with the children [grandmother], which means that there's a definite safety risk in her judgment."
Mother testified that she does not believe it is unsafe for grandmother to be around children. She explained that she had had grandmother babysit the children in December 2016 because her regular babysitter was busy and having grandmother come to her apartment, rather than taking the children somewhere else, would be the least disruptive of the children's routine.
After the state rested its dependency case, mother moved to dismiss the jurisdictional petition. The court questioned DHS about what threat mother's mental health condition posed to the children. DHS answered, "Injury *561 in the care of unsafe people." DHS argued that mother's mental condition causes her not to recognize that people like grandmother and CV are dangerous to the children. With respect *97 to grandmother, DHS argued that the safety concern was related to grandmother having a history with DHS herself, including having children removed from her care, and her delay in answering the door when DHS visited in December 2016. Mother argued that the record did not establish a nonspeculative threat of harm to the children, given that (1) mother had separated from CV, (2) the children had not been exposed to the domestic violence between them and had not been around CV after he first assaulted mother, (3) there was no evidence on this record of what grandmother's history with DHS is "and how it would present a current threat of harm to this child," and (4) the children were found to be fine when they were with grandmother in December 2016.
The court granted the dismissal motion with respect to two of the allegations in the jurisdictional petitions, finding that the state had not "met its burden of proof that the mother exposes the child[ren] to unsafe people and conditions." The court noted that it was uncontroverted that "CV was not around the children after the first domestic violence incident." The court also found "that there hasn't been proof that the grandmother was currently unsafe." The court also dismissed the allegation that mother lacks appropriate parenting judgment, ruling that, even if mother lacked some appropriate parenting judgment, the state had not established "a nexus between that and a current threat of serious loss or injury." However, the court denied the dismissal motion with respect to the remaining allegations.
At the end of the hearing, the court ruled that it would take jurisdiction based on the mental health allegation and, after some discussion with the parties, the court decided that the judgment should focus solely on mother's mental health diagnoses, including reactive attachment disorder, without referencing her cognitive limitations. The court explained:
"My main concern is on the mental health condition * * * that has manifest[ed] itself in a couple of different ways, and it has manifest[ed] itself in an evolving way. The original jurisdictional basis was mother perpetrating domestic violence against a partner. Then she got involved in another *98 relationship where she was the victim this time of domestic violence. Then she reengaged in that relationship and was the victim again.
"The thing that struck me from her testimony was that she in fact did use the batterer's intervention skills that she got. You know, domestic violence is a fluid situation. The-we always want to think about it as the after school special. There's a bad person and a good person and the reality is * * * that's not how it really works out, and that what I think what we saw here in the evolution for [mother] is * * * she used some skills that she was taught, which meant that she this time was the victim, rather than the perpetrator, * * * but they're part [and] parcel of-of one thing. It's not just the act of domestic violence itself. It's everything that leads up to that and the choices that lead up to that, that is of a concern."
The court ruled that mother's mental health condition manifests itself in ways
"that put her clearly at risk and I think by a preponderance of the evidence put her children at risk of situations that are physically dangerous at the very least emotionally and socially dangerous of * * * what they have been exposed to, and what they would be exposed to without DHS's involvement, and * * * likely to be exposed to in the future."
On appeal, mother does not dispute that the record includes evidence that she has a mental health condition that has contributed to her entering into relationships and associations with individuals who prove violent or unsafe. However, she contends that the record does not include evidence of "a nexus between those relationships and associations and a harm to her children that was nonspeculative and current or likely to be realized." In particular, she observes that the record includes no evidence that her children were present during any incident of domestic violence and that the trial court found that DHS
*562 had not proved that grandmother presented a threat of harm to the children. In response, DHS does not develop an argument that the mental health allegations, standing alone, pose a present threat of harm to the children. Instead, it contends that "mother's mental health condition contributes to the risks to [the children] associated with the already-established basis *99 of jurisdiction, which related to mother's domestic violence against [one child's] father."
In assessing the parties' arguments, we start with basic principles. A juvenile court may assert dependency jurisdiction over a child if the child's "condition or circumstances are such as to endanger the welfare of the [child] or of others." ORS 419B.100(1)(c). "To endanger the child's welfare, the condition or circumstances must create a current threat of serious loss or injury to the child and there must be a reasonable likelihood that the threat will be realized." S. P. , 249 Or.App. at 84, 275 P.3d 979 (internal quotation marks omitted). The focus must be "on the child's current conditions and circumstances and not on some point in the past." Dept. of Human Services v. L. G. , 251 Or.App. 1, 4, 281 P.3d 681, adh'd to as modified on recons . , 252 Or.App. 626, 290 P.3d 19 (2012).
That focus on threat of harm to the child remains when, as here, a juvenile court already has taken jurisdiction over a child on one basis and a new or amended petition alleges additional bases for dependency jurisdiction. Thus, when a parent challenges a juvenile court's decision to assert jurisdiction on additional bases,
"we examine whether sufficient evidence exists, from which a reasonable factfinder could conclude by a preponderance of the evidence, either that a current risk of harm to [the child] exists from the additional allegation standing alone, or that the additional allegation contributes to or enhances the risk associated with the already established bases of jurisdiction."
Dept. of Human Services v. S. R. C. , 263 Or.App. 506, 511, 328 P.3d 814, rev. den. , 356 Or. 397, 337 P.3d 127 (2014) (internal quotation marks omitted). "We consider each additional allegation in connection with any other allegations because sometimes two allegations together present a more compelling case than either one alone." Id. (internal quotation marks omitted).
As noted, DHS does not develop an argument on appeal that mother's mental health condition, standing alone, presents a current threat of serious loss or injury to her children. Nor could any such argument succeed. The *100 record includes no evidence that any of mother's relationships have resulted in her exposing the children to unsafe people or situations: the juvenile court found specifically that DHS had not proved that grandmother is unsafe, and there is no evidence that the children were present during any of the three documented incidents of physical abuse between mother and her romantic partners. Nor is there evidence that domestic violence was so prevalent in mother's relationships that it created the kind of "chaotic and physically threatening environment" that itself can be harmful to children. See Dept. of Human Services v. C. M. , 284 Or.App. 521, 528, 392 P.3d 820 (2017) (affirming jurisdiction based on domestic violence where nobody "shielded or otherwise protected [the child] from the domestic violence unfolding around him" and there was no dispute that the child "was in a chaotic and physically threatening environment"). In short, evidence that mother's mental health problems may contribute to her being involved in violent relationships does not itself, standing alone, establish that those relationships are reasonably likely to present a serious threat of harm to her children. See Dept. of Human Services v. K. C. F. , 282 Or.App. 12, 19, 383 P.3d 931 (2016) ("Domestic violence between parents poses a threat to children when it creates a harmful environment for the children and the offending parent has not participated in remedial services or changed his or her threatening behavior." (Emphasis added.) ).
DHS argues, nonetheless, that it adequately established that mother's mental health condition "contributes to the risks to [the children] associated with the already-established basis of jurisdiction, which related to mother's domestic violence against [LS]." That is because, according to DHS, "it *563 increases the likelihood of further domestic violence between mother and her domestic partners" and because it "affects the services she needs to resolve the original basis for jurisdiction, such as domestic-violence treatment programs."
But referring back to the original basis for jurisdiction does not add any information as to how mother's mental health condition presents a current threat of serious harm to the children. This record includes no information regarding the nature of the "safety risk" to which mother admitted *101 in 2015. The only evidence is that mother's children were not present during the single incident of domestic violence that led to the 2015 jurisdictional judgments and nothing in the record explains why, nonetheless, mother admitted that she needed assistance from the court and DHS to resolve that unidentified safety risk. Because this record does not establish what threat of serious harm to the children existed in 2015, any evidence that mother's mental health condition contributed to what happened at that time also cannot establish that the existence of that condition presently puts the children at risk. Cf. Dept. of Human Services v. L. C. , 267 Or.App. 731, 743, 343 P.3d 645 (2014) ("[T]o continue jurisdiction based on a parent's past conduct, it must be reasonably likely that the parent will engage in that conduct again and will do so in a way that will put the child at risk of serious loss or injury.").
We appreciate the juvenile court's assessment that mother's experiences with domestic violence are complex and evolving. The record supports that assessment. However, recognition of the complexities of domestic violence, and evidence that mother's mental health condition increases the likelihood that her relationships will involve such violence, cannot substitute for evidence of an actual threat of serious loss or injury to the children that is reasonably likely to be realized. Accordingly, we reverse the May 2017 jurisdictional judgment.
Reversed.

Mother testified at the hearing on the 2017 dependency petitions that she had been removed from her parents' home because her father "shot himself in front of us." Indeed, a 2012 psychological evaluation indicates that, although "family disruption" was apparent earlier, "child welfare had intervened following a suicide attempt" by mother's adoptive father. However, DHS caseworker McKittrick testified that grandmother had "a significant child welfare history" that included physical abuse of her children, including mother. The record includes no further details of that assertion of abuse.

The 2017 petitions resulted in the dependency judgments that are at issue in this appeal; the 2015 petitions and judgments have different case numbers.

In conjunction with judicially noticing the 2015 petitions and judgments, we observe that, on appeal, mother has cited to the judgments and other filings in the 2015 case without objection from the state.