HADLOCK, P. J.
*689 The Department of Human Services (DHS) filed a dependency petition in 2017 after it received reports that mother and her five-year-old child were homeless, that mother was using drugs in child's presence, and that mother was neglecting child, who has significant disabilities that require constant attention. Father, who had not lived with mother and child for about two and a half years at that point, contacted the agency. DHS then filed an amended petition adding two allegations related to father, specifically that child is endangered because (1) father needs assistance from the court and the state to meet child's basic and special needs, and (2) father is "unable to protect the child from the mother because he lacks full custody." The juvenile court entered a judgment asserting jurisdiction over child on those two bases, as well as bases related to mother's residential instability and need for assistance in meeting child's needs.[1] On appeal, father argues that the record does not support the juvenile court's assertion of jurisdiction on the two bases related to his alleged inability to care for and protect child. We agree and, accordingly, reverse.
Father has not requested that we exercise our discretion to review de novo , ORS 19.415(3)(b), and this is not an exceptional case in which we find de novo review appropriate. See ORAP 5.40(8)(c) (we review de novo "only in exceptional cases"). Accordingly, in reviewing the dependency judgment, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." Dept. of Human Services v. N. P. , 257 Or. App. 633, 639, 307 P.3d 444 (2013). In this case, the juvenile court issued a detailed and thoughtful letter opinion. We are bound by the court's explicit and necessarily implied findings of historical fact, as expressed in that letter and elsewhere in the record, as long as any evidence supports them. Id. at 639-40, 307 P.3d 444. We state the facts in accordance *690 with that standard, setting them out in some detail because of the significance of child's special needs and the juvenile court's concern that father would not follow through with meeting those needs.
Child was born in early 2012 and she initially lived with both parents. Father moved out when child was about two years old. Sometime in 2015, father saw that mother "was having some other issues," and so he took child into his home. Child remained in father's care for about one month. During that period, child twice got out of father's home, was found unsupervised in a parking lot, and was returned to father by police officers. Father installed child-proof locks on his doors after the second incident, at a police officer's instruction. Although child exhibited pica at that early age, father did not feel that her needs rose to the level of developmental disabilities; he testified that child's *1191 doctor then was unsure whether child had special needs or was just being "a toddler."[2] Child did have the opportunity to participate in an early-intervention program of some sort, but father did not take her to that program.
After child had been living with father for about a month, mother came to father's home with police officers. Father had not yet been legally determined to be child's father and he did not have a custody order. Accordingly, he relinquished child to mother in the police officers' presence. Although the record is not entirely clear on this point, it appears that a juvenile court asserted jurisdiction over child at around this same time; it also appears that the court dismissed jurisdiction in late 2015, when mother was in a residential treatment facility and had a few months of sobriety. By that point, DNA testing had confirmed father's paternity.
Father did not have contact with child for the two and a half years that passed between mother taking child from father's home and when DHS became involved again in late 2017. Father testified that, at some point, DHS told him that mother was competent to care for child and that mother and child were in a treatment facility. During that *691 time, father did not seek to learn child's whereabouts from DHS, he blocked mother from sending him messages via Facebook (because she was "rude and derogatory"), and he did not seek information about child from other family members who were on good terms with mother. Father explained at trial that he and mother "have had numerous domestic violence situations" and he thought it could get "physical" again if they saw each other. He testified that he therefore stayed away from mother for his own safety and for child's safety. Father acknowledged that he had some concerns that mother's volatility would pose a risk to child. When asked what he did to try to mitigate that concern, father answered, "Honestly, I did nothing."
Child came to DHS's attention again in 2017, after DHS received reports that mother was neglecting child, who was then five years old. Child subsequently was assessed with significant disabilities, including autism spectrum disorder, cognitive and motor skills delays, and pica. Child is mostly non-verbal, does not use a toilet independently, and will eat feces and other non-edible, hazardous items if not constantly supervised. Child sleeps only three to five hours each night and therefore requires round-the-clock supervision. She also needs assistance with all activities of daily living.
Child's current DHS caseworker, who works primarily with developmentally disabled children, testified that child has the highest needs of any developmentally disabled child on her caseload. Child lives in foster care in Marion County and, since mid-2017, she has had a caseworker with the Marion County agency that provides services to individuals with developmental disabilities. That caseworker, Winslow, testified similarly that child needs support for all activities of daily living.
DHS filed a jurisdictional petition in September 2017 and an amended petition in October 2017, after father contacted the agency. The amended petition included the following allegations involving father, who lives in east Portland, near Gresham:
"D. The conditions and circumstances of the child are such as to endanger the welfare of the child by reason of *692 the following facts: The child's father needs the help of the Court and State to meet the child's basic and special needs.
"E. The conditions and circumstances of the child are such as to endanger the welfare of the child by reason of the following facts: The child's father is unable to protect the child from the mother because he lacks full custody."
A hearing on the jurisdictional petition started on December 6, 2017, and continued on February 22, 2018.
DHS caseworker Golden testified in February about the agency's involvement with child from August 2017 through the time of hearing. Golden testified that there had been *1192 numerous meetings about child's needs and developing an individual support plan (ISP) and other supports for her. Golden acknowledged that, after the ISP was developed, she did not contact father to update him with that information, as she thought "it was more important and it was urged for [father] to contact [child's developmental-disabilities caseworker] Winslow directly." Golden also acknowledged that father's attorney had requested information regarding child's school and service providers and that DHS did not supply that information. Rather, she testified, father could have accomplished that by working "with [developmental disability] services."
Golden also testified that she had concerns about father's apparent plan to have his partner, Angel, provide caregiving to child, given Angel's own child welfare history. Golden unsuccessfully attempted to schedule a meeting with father and Angel to address those concerns. Father wanted DHS workers to visit him and Angel in his east Portland home. Golden declined to send a DHS worker there; she wanted father and Angel to meet with her in Salem, perhaps in conjunction with one of father's visits with child. As discussed below, father missed most of the visits with child that had been scheduled in Salem between December 2017 and February 2018, and the meeting never happened.
Winslow, who is child's Marion County developmental-disabilities caseworker, testified that child receives occupational and speech therapy and that child's services could be transferred to Portland if she moved there. When the jurisdictional hearing started in December 2017, father had not *693 contacted Winslow. Indeed, father testified in December that he had not spoken with Winslow because, in his view, somebody from that agency was "supposed to call [him] * * * and they never did." In addition, father asserted at the December hearing that he did not need to speak with Winslow to understand child's needs and how to care for her because he has "taken care of DD children most of [his] life." However, by the second day of the hearing, in February 2018, father had called Winslow spontaneously and they had an "in-depth conversation about services" and "what it could look like for [father] if he was to have his daughter in his home." Father wanted trainings, to know more about child, and to know how to help child. Winslow emailed father more information after they spoke.
Father has had five visits with child, most of which occurred before the jurisdictional hearing began in December. A visitation worker who supervised the visits from behind a one-way mirror testified that the visits tended to go very well. Father was attentive to child's pica and her other special needs. The worker's own notes from the visits reflect that child called father "daddy" and expressed joy in their interactions. The notes also reflect that father was gentle and patient with child, redirected her when necessary, was cheerful and used a sense of humor with child, and attended to her needs. A file note indicates that the visitation worker stated, perhaps in response to a survey, that he had no concerns regarding father's ability to parent this child.
Father missed all but one of the weekly visits with child that had been scheduled between the December and February hearing dates. He alerted DHS when he was going to miss a visit. Father missed at least some visits because of transportation difficulties; he also asserted that he had the flu for a few weeks. Father does not have a car and-when he did visit child-he took public transportation from his home near Gresham all the way to Salem.[3] Father also gave up one visit because it was planned to be a joint visit attended *694 by father's own mother, with whom he has a difficult relationship. Father decided not to attend that visit so that his mother could visit with child instead; he understands that she wants to see her granddaughter.
Father testified about his plans to care for child if she is returned to his care. Father understands that child has been diagnosed with pica and autism. He testified that he would need to make child's appointments, *1193 take her to those appointments, ensure that she goes to school, make sure that she does not "put anything in her mouth," and take care of "all her individual needs." From his visits with child, father knows that she must be given something to focus on so she is not as "rambunctious." In caring for child, father would draw on his previous experiences working as a caregiver for other people with disabilities, including autism and Alzheimer's disease. He has "taken care of people with pica." He has training in CPR and first aid. After DHS removed child from mother's care in 2017, father located and completed an eight-hour course on caring for children with autism. Father testified that he has reviewed child's treatment and educational plans and that he is willing to implement those; he believes that she "needs at least speech therapy."
Father has spoken with somebody at the Multnomah County agency that provides services for people with developmental disabilities. His understanding (consistent with testimony from other witnesses) is that child's services can be transferred from Marion County to Multnomah County if she lives with him. Father also testified that, if child were returned to his care, he would enroll her in a special-needs program in the Reynolds School District. He has spoken with somebody at that program, who talked about the services they can offer child. Father acknowledged that, when asked what is important to her, child indicated that mother is the most important. Nonetheless, father testified that he does not think it is important for child to have both her parents involved.
Although father currently works full-time, he testified in December that he would drop down to part-time hours and work only while child was at school; he testified *695 that his partner, Angel, would provide respite care. Father acknowledged that Angel suffers from anxiety and uses marijuana; he did not believe that her anxiety presents a barrier to her helping care for child. By February, Angel had received a job offer and father testified that he would quit his job and be a stay-at-home father to child: "She needs a 24-hour caregiver so I will be here 24-hour days."
The juvenile court issued a lengthy letter opinion explaining why, on the record described above, it found that DHS had proved that father "needs the help of the Court and State to meet the child's basic and special needs" and that father "is unable to protect the child from the mother because he lacks full custody." The court focused on the month in 2015 during which child lived with father, noting the two times that child wandered outside the home and father's failure to take her to early-intervention services during that month. The court also observed that father had not attempted to have contact with child or to inquire about her well-being when she lived with mother from 2015 until 2017. That lack of involvement and father's apparent failure to adequately supervise child in 2015 left the court with "serious doubt about [father's] level of commitment to following through with the significant responsibility of constant care and monitoring that [child] needs, and the level of his awareness and concern about filling those needs." The court also expressed concern about father having relinquished child to mother in 2015 "when she arrived with police to regain physical custody" after child had been in his care for a month; the court concluded that the incident demonstrated father's inability to protect child from mother absent a custody order. The court therefore entered a judgment taking jurisdiction over child on the bases identified above.
On appeal, father argues that the record does not support either of the asserted bases for jurisdiction under ORS 419B.100(1)(c). The requirements for dependency jurisdiction are well established:
"A juvenile court may assert dependency jurisdiction over a child if the child's 'condition or circumstances are such as to endanger the welfare of the [child] or of others.' ORS 419B.100(1)(c). To endanger the child's welfare, the *696 condition or circumstances must create a current threat of serious loss or injury to the child and there must be a reasonable likelihood that the threat will be realized. The focus must be on the child's current conditions and circumstances and not on some point in the past."
*1194 Dept. of Human Services v. S. A. B. O. , 291 Or. App. 88, 99, 417 P.3d 555 (2018) (some quotation marks and citations omitted). DHS has the burden of proving facts sufficient to establish a basis for jurisdiction. Dept. of Human Services v. B. L. J. , 246 Or. App. 767, 773, 268 P.3d 696 (2011).
Father first challenges the juvenile court's determination that child's welfare is endangered because he lacks full custody and therefore would be unable to protect child from mother. He contends that DHS "presented no evidence that mother would attempt to remove [child] from father's care or that father would be unable to protect [child] should mother attempt to do so." We agree. This record includes no evidence that mother is currently in a position to insist that father deliver child to her; nor does it include any evidence that she is likely to make such a demand or that father would be unable to resist it. The fact that father complied with a demand to relinquish child to mother in 2015 when she was accompanied by police officers does not provide a basis for finding that father would fail to protect child from mother in 2017, under the very different circumstances that existed at the time of the jurisdictional hearing. See Dept. of Human Services v. J. R. , 274 Or. App. 107, 112, 360 P.3d 531 (2015) (lack of a custody order standing alone is insufficient to support jurisdiction; there must be "evidence that the fit parent is unable to protect the children" from the unfit parent); id. at 112-13, 360 P.3d 531 ("The fact that police declined to intervene on [the father's] behalf [when he] lacked physical custody * * * is not a basis for concluding that father would be unable to protect the children. Going forward, the roles would be reversed. Father would be the parent with physical custody.").[4]
*697 The other basis on which the juvenile court took jurisdiction-that child's welfare is endangered because father needs assistance in meeting her needs-presents a closer call. We begin by noting our agreement with the juvenile court on a critical point. The record in this case strongly supports a determination that "there [is] a reasonable likelihood" that child will suffer "serious loss or injury" if her caregiver is not closely attentive. See S. A. B. O. , 291 Or. App. at 99, 417 P.3d 555. Her disabilities-particularly her pica-are such that she is likely to suffer harm if she is left unsupervised for any meaningful amount of time or is not assisted with daily tasks like eating and toileting. Thus, the question here is whether this record supports a determination that the threat of that harm currently exists and is reasonably likely to be realized. Put differently, does the record establish that, if child were returned to father's care, it is reasonably likely that he would fail to adequately supervise her and attend to her daily needs? We conclude that it does not. As explained below, we agree with father that the juvenile court's analysis was overly "focused on the past and not the present" and that the current circumstances do not establish a threat to child that is reasonably likely to be realized. See generally S. A. B. O. , 291 Or. App. at 99, 417 P.3d 555 ("The focus must be on the child's current conditions and circumstances and not on some point in the past." (Internal quotation marks omitted.) ).
The juvenile court emphasized three aspects of father's conduct that it found particularly troubling. First, the court found that father did not constantly supervise child when she lived with him for one month in 2015. The record supports that finding of inadequate supervision, which led to child twice leaving father's home without him noticing. However, evidence of those incidents more than two years before the dependency hearing-incidents that stopped when father followed through on a recommendation to install child-proof door locks-is insufficient to support a determination that child currently would be at risk if returned to father's care. Nor does father's failure to take child to early-intervention services during that month speak meaningfully to how he would *1195 now care for her, given his more recent inquiries into educational and other support services available to her. Cf. *698 Dept. of Human Services v. M.Q. , 253 Or. App. 776, 787, 292 P.3d 616 (2012) ("Jurisdiction cannot be based on speculation that a parent's past problems persist at the time of the jurisdictional hearing in the absence of any evidence that the risk, in fact, remains.").
Second, the juvenile court relied on father's lack of communication with mother and his lack of effort to ensure child's safety when she lived with mother from 2015 to 2017. That lack of involvement certainly can be viewed as less than optimal. But it, too, is insufficient to support a finding that father would not adequately care for child if she were returned to his physical custody. The only evidence regarding what happened in the months following child's return to mother in 2015 is that mother and child were in residential treatment-as father was told when he inquired-and that jurisdiction subsequently was dismissed, presumably because the court was satisfied that mother could adequately care for child. Although father had had concerns about mother's volatility, the fact that he chose not to intervene in those circumstances does not provide a basis for inferring that he would not meet child's needs if she lived with him.
Third, the juvenile court emphasized that father has not done all he could to communicate with DHS and with child's caseworkers. It is true that father could have done more than he did to track child's progress and to learn more about her needs. And the juvenile court could reasonably view father as having been recalcitrant in his dealings with agency workers. Again, however, evidence that father has taken a less-than-optimal approach to working with DHS and service providers does not equate to proof that it is reasonably likely that child will suffer harm if returned to his care. At least, that is so in the context of this case. Father is not a parent who has little understanding of his child's special needs and little desire to learn about them. Cf. Dept. of Human Services v. L.F. , 256 Or. App. 114, 120-21, 299 P.3d 599, rev. den. , 353 Or. 787, 304 P.3d 466 (2013) (in a "close call," affirming dependency judgment where the record supported a finding that the mother was "unable or unwilling to meet and understand [her disabled child's] medical and *699 developmental needs," posing a risk of harm reasonably likely to be realized; among other things, the mother had not complied with court orders to regularly attend the child's therapy sessions and classes, leaving the mother unable to understand and meet the child's needs). This is a parent who has actively sought out information about his child's disabilities and the services available to her, and who asserts that he will provide child with round-the-clock care. Nothing in this record supports a finding that it is reasonably likely that he will not do so.[5]
Child indisputably has extraordinary needs that demand a vigilant parent. One may reasonably wonder whether, over time, father will be able to consistently meet the demands of caring for her. But every young child has needs that require focused caregiving, and a juvenile court cannot assert jurisdiction over a child simply because it is concerned that a parent might not be sufficiently attentive. Put differently, DHS does not prove a basis for dependency jurisdiction merely by establishing that one cannot be certain that a child's mother or father will be up to the task of parenting. Rather, DHS must come forward with evidence sufficient to establish that the parent in fact has parenting deficits that "create a current threat of serious loss or injury to the child" that is reasonably likely to be realized. See S.A.B.O. , 291 Or. App. at 99, 417 P.3d 555. The same is true *1196 here, even though the demands on this child's caregivers will be far greater than average. In our view, evidence regarding the totality of the circumstances-including child's special needs, father's previous lack of involvement with child, his failure to adequately supervise her in 2015, and his lack of optimal engagement with DHS and service providers-does *700 not support a determination that father would currently fail to attend to child's needs and that serious loss or injury is reasonably likely to follow.
Reversed.

Mother has not appealed and father has not challenged the juvenile court's jurisdictional determinations related to mother (based on allegations 2A and 2C of the amended petition). Accordingly, those determinations are not at issue here.

Child's developmental-disabilities caseworker testified that pica is the behavior of "eating things that are not food."

The juvenile court observed that travel from the area of father's home to Salem by public transportation "is a long and arduous process" and that, were child placed with father, "the barrier of long-distance travel would be gone."

We note that the petition and judgment in this case are phrased in terms of father not having "full custody," while many cases that discuss an otherwise fit parent's purported inability to protect a child from the other parent are phrased in terms of whether the fit parent has a "custody order." DHS does not argue that the difference in phrasing has significance to the issues before this court, and we do not perceive any such significance.

The juvenile court also discussed two other aspects of father's lack of cooperation or understanding. First, father asserted that he did not view his partner's child-welfare history as relevant to child's placement with him. However, the record in this case does not reveal anything about what that child-welfare history involved and, therefore, could not provide a basis for a determination that child would be at risk of harm if returned to father's care. Second, when questioned at trial, father suggested that he did not feel it important for child to maintain a relationship with mother, even though child has expressed that mother is important to her. That single answer to a question at trial is insufficient-even when considered in context with the other evidence in this case-to establish that father is likely to actually interfere with child having an ongoing relationship with mother.