Argued and submitted December 6, 2019, reversed April 8, 2020

In the Matter of A. P. J. M.,
a Child.

DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

W. M.,
*Appellant.*

Jefferson County Circuit Court
19JU00729; A171773

463 P3d 572

Father appeals the juvenile court's judgment taking jurisdiction over his child, A. Father contends that the Department of Human Services (DHS) failed to present sufficient evidence that father's substance abuse and parenting skills, either individually or collectively, exposed A to a nonspeculative risk of serious loss or injury at the time of the dependency hearing, and, therefore, the juvenile court erred when it took jurisdiction on those bases. *Held*: DHS failed to carry its burden to demonstrate that father's alleged substance abuse or deficits in parenting skills posed a current risk of loss or serious injury to A. Therefore, the trial court erred in taking jurisdiction on those bases.

Reversed.

Daina A. Vitolins, Judge.

Shannon Flowers, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Shannon Storey, Chief Defender, Juvenile Appellate Section, Office of Public Defense Services.

Sean McKean, Certified Law Student, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Benjamin Gutman, Solicitor General, and Christopher A. Perdue, Assistant Attorney General.

Before Armstrong, Presiding Judge, and Tookey, Judge, and Aoyagi, Judge.

TOOKEY, J.

Reversed.

**TOOKEY, J.**

In this juvenile dependency case, father appeals from the juvenile court's judgment taking jurisdiction over his child, A.[1] In his first through third assignments of error, father asserts that the Department of Human Services (DHS or the department) failed to present sufficient evidence that father's substance abuse and parenting skills, either individually or collectively, exposed A to a nonspeculative risk of serious loss or injury at the time of the dependency hearing. Accordingly, father contends that the juvenile court erred in taking jurisdiction on those bases. We agree with father and reverse.[2]

Neither party requests that we exercise our discretion to review this case *de novo*, and we decline to do so. ORAP 5.40(8)(c). Therefore, we "view the evidence, as supplemented and buttressed by permissible derivative inferences, in the light most favorable to the trial court's disposition and assess whether, when so viewed, the record was legally sufficient to permit that outcome." *Dept. of Human Services v. N. P.*, 257 Or App 633, 639, 307 P3d 444 (2013). We state the following facts in accordance with that standard.

## I.  BACKGROUND

This case concerns father's child, A, who was two years old at the time of the dependency jurisdiction trial. DHS filed a dependency petition alleging, in pertinent part, that father's "substance abuse, which includes the use of methamphetamine, interferes with his ability to safely parent [A]," and that "father needs the assistance of DHS and the court to develop the skills necessary to safely parent [A]." We confine our discussion to the facts pertinent to the bases on which the juvenile court took jurisdiction.[3]

---

[1] Mother admitted to several of the alleged bases for taking jurisdiction over A, and she does not appeal the judgment taking jurisdiction over A.

[2] In his fourth assignment of error, father contends that the "trial court erred in ordering father to submit to a psychological evaluation" as part of the treatment necessary to correct the circumstances underlying the juvenile court's establishment of jurisdiction over A and to prepare father to be reunified with A. Our reversal of the jurisdictional judgment obviates the need to address father's fourth assignment of error.

[3] DHS also alleged that A was endangered because father exposed A to domestic violence. At the dependency hearing, DHS withdrew its allegation that

Father lived in Mississippi where father had two adult children and a teenager from a previous relationship whom he had helped to raise. Father met mother in Mississippi, and they used methamphetamines together. In 2016, mother became pregnant, and father and mother moved to Oregon. When A was born in November of 2016, father was "somewhat involved" in A's upbringing and, for the most part, "was able to do the *** basic [things to] *** take care of *** what [A] needed" like changing diapers and helping with food. Although father was able to provide "basic care" for A, it was difficult for father to engage in certain physical activities with A because father has scoliosis that remained untreated when he was growing up and, as a result, he had "been dealing with pain for years." Father lived with mother and A until November 2017 when mother and father ended their relationship.

From November 2017 to June 2018, father was homeless and living in a shelter in another city, making visits with A sporadic and difficult. In May 2018, father started voluntarily participating in a mental health and substance abuse treatment program at Best Care and was able to find housing through that program. Although he was no longer on good terms with mother, father obtained toys, clothes, and a bed for A, and was able to visit with A at his apartment a couple times a week for a few hours at a time. Father's drug treatment providers also gave father permission to have A move into the apartment that he obtained through the housing program after his drug counselor had been present for visits between A and father at his apartment.

In August 2018, DHS became involved with mother and A because of reports of substance abuse and domestic violence between mother and her boyfriend, Horton. Following reports from father and father's counselor about their concerns for A's safety, in September 2018, the police and DHS investigated a possible burn from a cigarette lighter that A had gotten when Horton was watching A while mother was at a neighbor's apartment. From the shape of the burn, it appeared that someone had heated up the metal top of a

---

father's exposure of A to domestic violence created a nonspeculative risk of serious loss or injury to A.

lighter and "put [it] onto [A's] arm." Mother did not report to the police that A had been burned by a lighter. Shortly thereafter, father filed for custody of A because he was concerned that A "was in trouble."

In November 2018, father had "major back surgery" to deal with the complications from his untreated scoliosis. The surgery entailed putting a "rod, screws, and bolts," in father's back, and he was in a significant amount of pain afterwards.

In January 2019, the department planned to "implement an in-home plan" with father caring for A. On January 22, 2019, father provided a urine sample (UA) at the treatment facility, and the sample tested positive for methamphetamine. Father denied using methamphetamine but admitted to his drug and alcohol counselor that he "drank a couple of beers" to numb his back pain. Because the department's protective services worker believed she could not assess father's ability to parent A when he denied drug use, she removed A (who had been living with mother and her half-siblings) from mother's care, placed A in foster care with A's maternal aunt and uncle, and moved forward with filing a dependency petition. On January 28, 2019, DHS filed a dependency petition alleging that father's substance abuse and lack of parenting skills endangered A's welfare.

Father continued in substance abuse and mental health treatment, but his attendance became more sporadic after his surgery. Father had complications from the surgery that caused him a lot of pain from the "disk [in his] back with the rod and screws and bolts just shifting" and father went to the emergency room several times as a result. Father also had issues with transportation to his treatment classes and visits with A because he could not walk that far. At father's annual assessment for substance abuse treatment in mid-April, it was recommended that father needed a "low level of care," to "develop[] a relapse prevention plan," have "some monitoring for abstinence," and to "just build[] his support network." But father's counselor clarified that he always recommends some sort of relapse recovery or support network plan to anyone who has undergone substance use treatment, "[e]ven if they've been sober for 20 years."

Father's substance abuse counselor noted that father had not been ordered by the court to attend treatment and that father's motivation to engage in treatment was to obtain stable housing and to be a better parent to A. There was also no indication that father's substance use ever involved A, or that father had used drugs in front of A. Father had expressed "his concern for other people using drugs around" A and stated that he would take A "away from people [who] were using drugs around her" and "do anything to keep her safe." The counselor observed that father is aware that exposing A to drugs is unsafe and that father "recognizes the strengths that he is gaining as a result of him being engaged in treatment." Additionally, a clinician, who coordinated father's mental health and substance abuse treatment plans at Best Care, reported that father was "progressing well" and had developed "new coping skills." The clinician had "observed positive changes" with regard to father's desire to become a better parent, such as a "list of clean urine" tests. Given father's participation in, compliance with, and progression in mental health and substance abuse treatment, the clinician did not have any concerns about father's ability to safely parent A if she were immediately returned to father's care.

In March 2019, father moved into a one-bedroom apartment that required climbing steep exterior stairs. Father was unable to move all of A's belongings into his new home, so he put them in storage. DHS's "primary reason" for filing the allegation of parenting issues was because of its concern "that [father] may not be able to safely parent [A] due to his physical inabilities." Specifically, DHS was concerned that father would be physically unable to help A by holding her hand on the steep stairs or that A could get out of the front door to the stairs because the only "barrier" to prevent A from opening the front door was a lock. A DHS worker also observed that a piece of wood flooring in the kitchen was raised up "a little bit higher than the rest of the flooring, so it was not even" and "would pose a tripping hazard."

To support its concern about father's ability to safely parent A, DHS pointed to two supervised visits at DHS: (1) a visit in which A found and picked up scissors on a countertop

in the DHS "play room" before father took them away, and (2) a visit where A passed through an unlocked door and ran back to an adjacent room where she had just visited with her mother and her siblings before father could stop her. Although the DHS workers had concerns about father's parenting skills, they also observed that A was excited to see father during visits and was "easy going" when she was around father, and that A and father had a "clear bond."

Father did not have any UAs after January 2019 that tested positive for methamphetamines and, on May 1, 2019—14 days before the jurisdictional hearing—father had a clean UA. Furthermore, at an unscheduled visit to father's home on May 10, 2019, father had adequate food, and there were no signs of drug use or paraphernalia.

The hearing began on May 15, 2019, and DHS adduced evidence to support the facts described above. The juvenile court concluded that DHS had proved that father's substance abuse and lack of parenting skills presented a current threat of serious loss or injury to A at the time of the hearing. The trial court found (1) that father was "over-whelmed" due to his many appointments and therefore "shuts down" and lacks engagement with A; (2) an "absolute lack of a relationship" because father did not know A's date of birth, clothing size, and whether she was toilet trained; (3) father lacked the skills necessary to parent A as evinced from his testimony that he "would politely talk" with A if A cries or throws a temper tantrum; (4) father has "none of the basics that she would need in terms of housing, of bedding, of no high chair, no ability to feed" A; (5) father's failure to sign up for a parenting class that was offered to him; (6) that father misses treatment appointments and visitations with A due to his tendency to shut down; (7) father's inattentive-ness as evinced by A escaping a room to see her mother. As for father's substance abuse, the court stated:

> "I also find that his ongoing substance abuse presents a risk to [A] for these reasons. As indicated by Ms. Parsons, the fact that he won't admit that he relapsed, and it's clear from [DHS] that he did. And his counselor also testified that he relapsed on—by using alcohol as well. He won't admit that, and he testified that he goes to treatment because he needs the housing.

"Then there's no ability to assess whether or not he is a risk to [A], and that becomes a risk because, as Ms. Parsons said, we don't know when he uses or who he uses around or how often he does that and whether or not that would—I mean, I find that that would present a risk to [A], the fact that we don't know what's going on with him.

"* * * * *

"And so I do find that the State has met their burden on allegation—hold on just a moment. On [allegation] E, that his substance abuse, which includes the use of methamphetamine, interferes with his ability to safely parent [A] * * *."

## II. CURRENT RISK OF HARM

ORS 419B.100(1)(c) provides that a juvenile court has jurisdiction in a dependency case when a child's "condition or circumstances are such as to endanger the welfare" of the child.

"A child is endangered if the child is exposed to conditions or circumstances that present a current threat of serious loss or injury. The burden of proof rests with DHS to establish that the threat is current and nonspeculative. Importantly, it is not sufficient for [DHS] to prove that the child's welfare was endangered sometime in the past. And, there must be a reasonable likelihood that the threat will be realized. DHS has the additional burden of proving a connection between the allegedly risk-causing conduct and the harm to the children."

*Dept. of Human Services v. F. Y. D.*, 302 Or App 9, 19, 459 P3d 947 (2020) (internal quotation marks and citations omitted).

A. *Parenting Skills*

DHS contends that "[l]egally sufficient evidence supported the juvenile court's finding that there was a reasonable likelihood of harm to A if she were to be placed in father's care because of father's lack of parenting skills or a relationship with A." DHS relies primarily on the evidence of father being in "[p]ain and overwhelmed" after his surgery, which resulted in him becoming less engaged in his voluntary treatment program, and points to the two "specific instances" mentioned above where father was visiting

A at DHS to support its contention that "father's tendency to 'shut down' created a risk of harm to A." More specifically, the department relies on the visit in which A found and picked up scissors on the countertop in the DHS "play room" before father took them away, and another visit at DHS where A had passed through an unlocked door and ran back towards an adjacent room where she had just visited with her mother and her siblings before father could stop A. DHS contends that that evidence shows that "father's pattern of shutting down posed a risk to A because she was likely to run down the stairs outside father's apartment or into the street."

We conclude that the risks identified by DHS relating to father's alleged deficits in parenting skills are too speculative to support jurisdiction. As we discuss in more detail below with regard to the allegation of father's substance abuse, the fact that father chose to become disengaged in his *voluntary* treatment program following back surgery does not demonstrate that father would be inattentive to A's needs, because there is "no evidence of a material relationship" between father's alleged substance abuse and his willingness or ability to attend to A's needs. *Dept. of Human Services v. J. J. B.*, 291 Or App 226, 239, 418 P3d 56 (2018). Likewise, father getting "overwhelmed" after his back surgery and missing other voluntary appointments does not demonstrate that father would not engage with A, or that father's lack of engagement in those other aspects of his life would pose a risk of serious loss or injury to A. *See Dept. of Human Services v. M. F.*, 294 Or App 688, 698, 432 P3d 1189 (2018) (observing that "evidence that father has taken a less-than-optimal approach to working with DHS and service providers does not equate to proof that it is reasonably likely that child will suffer harm if returned to his care"). As we explain, in this case, DHS offered no evidence of how A had been affected by father's purported deficits in parenting skills, much less how those purported deficits exposed A to a current nonspeculative risk of serious loss or injury.

We have recognized that "every young child has needs that require focused caregiving, and a juvenile court cannot assert jurisdiction over a child simply because it is

concerned that a parent might not be sufficiently attentive." *Id.* at 699. In other words, "DHS does not prove a basis for dependency jurisdiction merely by establishing that one cannot be certain that a child's mother or father will be up to the task of parenting." *Id.* When DHS relies on a parent's purported parenting deficits as a basis to petition for jurisdiction, "DHS must come forward with evidence sufficient to establish that the parent *in fact* has parenting deficits that create a current threat of serious loss or injury to the child that is reasonably likely to be realized." *Id.* (emphasis in original; internal quotation marks omitted).

In this case, with respect to the instance when A found scissors in the DHS play room, DHS offered no evidence that father had maintained his home as the department maintained its play rooms, namely by leaving scissors or other sharp items within A's reach, or that father would do so in the future. When the DHS worker performed an unscheduled visit at father's apartment five days before the jurisdictional hearing, there were no drugs, drug paraphernalia, or "knives available, willy-nilly." Moreover, we do not know if the scissors that A picked up were unsafe for a toddler to use under adult supervision, and the department did not demonstrate that father's response of taking the scissors away from A was inappropriate, or that it came too late so as to place A at risk of serious loss or injury. On this record, it is speculative to infer from father's failure to prevent A from picking up a pair of scissors in a DHS play room that A would be injured by household items if she was placed in father's care, or that father would fail to recognize circumstances around his home that would expose A to a serious risk of injury. Indeed, when asked by the court if father had "any concerns about the safety of [his] apartment to meet [A's] shelter needs," father explicitly recognized the danger that the steep stairs in front of his apartment would pose to a toddler—the very danger DHS contends that father would fail to recognize and mitigate—and father had also taken steps with his treatment provider to find housing that would be more suitable.

With regard to the evidence that A had passed through an unlocked door during a visit with father at DHS and ran back towards an adjacent room where she had just

visited with her mother and her siblings, that evidence does not support a nonspeculative inference that A would leave father's apartment unnoticed and be exposed to dangerous conditions outside. At that visit, A was running back to a familiar room where she had just visited with her mother and her other siblings and, although father got up to stop A, A "was definitely faster" and was able to escape the unlocked room. A never ran to any other part of the building, and no evidence was presented that father had ever left A unsupervised or that A had ever left father's home or any other place without him noticing. Again, DHS offered no evidence that father maintained his home as the department maintained its play rooms, that father was unaware that A left the room, or that father's response was inappropriate or exposed A to a risk of harm. Father had a lock on his front door, and the department offered no evidence that the lock would not prevent A from leaving the apartment before father could stop her, that father did not use the lock, or that he was likely to fail to use the lock if A was placed in his care. *See M. F.*, 294 Or App at 697 (concluding that evidence of the child twice leaving the father's home unnoticed two years before the dependency hearing was insufficient to prove that the father needed the assistance of the court and the state to meet the child's needs, because no similar incidents occurred after the father installed child-proof door locks, and, thus, the record would not support a determination that the child "*currently* would be at risk if returned to father's care" (emphasis in original)). Moreover, with regard to father's physical limitations, father had a plan in place with the support of A's maternal relatives to watch A if father was "having a down day and weren't as active or able to watch [A] as good as [he] could." Under those circumstances, the fact that A ran through an unlocked door to an adjacent room where A knew that her mother and siblings were located before father could stop her, does not support a nonspeculative inference that father would be unable to prevent serious harm from befalling A if she were to be placed in his care.

Likewise, we find the court's reliance on father's inability to provide specific details about A, such as her clothing size and toilet-training status, misplaced. A was

not toilet trained at the time of the hearing, and the fact that father did not think that A was toilet trained, but was unsure, does not establish that there was a current threat of serious loss or injury to A at the time of the hearing. We agree with father that many parents like himself, "who have not been their child's primary caretaker, do not at any given time, know such details about their child but can easily learn them." As father notes, although he may have to familiarize himself with the day-to-day details of being A's primary caregiver by, for example, taking A shopping or by going to the doctor with A and asking questions, the evidence does not demonstrate that father would fail to do so, or that father's current lack of knowledge in that sphere posed a threat of serious loss or injury to A. *See M. F.*, 294 Or App at 698 (concluding that, although the father's lack of communication and involvement with the mother and the child for two years was "less than optimal," it did "not provide a basis for inferring that he would not meet child's needs if she lived with him").

We also reject the department's contention that father's plan to "get close to [A] and try to calm her down" by "[p]olitely talk[ing] with her" if she throws a temper tantrum exposed A to a nonspeculative risk of harm. The department did not offer any evidence that A had special needs, that A threw uncontrollable temper tantrums, or that father's planned response would be inadequate to address any tantrums that A might have, much less that getting close to A and politely talking to A would give rise to a nonspeculative threat of serious loss or injury. To the contrary, as one of the DHS worker's observed, A was excited to see father during visits, was "easy going" when she was around father, and A and father had a "clear bond." Because DHS failed to present evidence sufficient to prove that father would be unable to familiarize himself with A's basic needs or respond to A appropriately without state intervention, we conclude that father's lack of familiarity with raising A on a day-to-day basis was not a circumstance that created a current threat of serious loss or injury to A that was likely to be realized if A were to be placed in father's care.

In sum, most of the "threats" to A's safety that DHS identified were generic household hazards, such as the steep

stairs outside of father's apartment or the uneven floorboards in father's home. The department's evidence that father took away scissors that A found in a DHS "play room" and was unable to prevent A from getting out of an unlocked door in the DHS play room does not demonstrate that father would be unable to mitigate common household hazards in his own home, let alone that he would fail to do so in a manner that exposed A to a nonspeculative "current threat of serious loss or injury that is likely to be realized." *Dept. of Human Services v. A. W.*, 276 Or App 276, 278, 367 P3d 556 (2016). Likewise, in this case, father's unfamiliarity with some of A's day-to-day needs was not a circumstance that created a current threat of serious loss or injury to A that was likely to be realized if A were to be placed in father's care. *See Dept. of Human Services v. D. M.*, 248 Or App 683, 687-88, 275 P3d 971 (2012) (concluding that there was no current threat of serious loss or injury to the child from the mother's failure to provide adequate supervision because, although the mother "may not have been an ideal parent," the "[e]xposure to a parent's unconventional but not unlawful lifestyle * * * and an unspecified amount of unsupervised access to the Internet do[es] not justify state intervention into a parent's fundamental right to the care, control, and custody of their children").

Although father's parenting skills may have been a little rusty and less than ideal, the law does not require ideal parenting. In other words, DHS "merely * * * establish[ed] that one cannot be certain that * * * father will be up to the task of parenting," and "a juvenile court cannot assert jurisdiction over a child simply because it is concerned that a parent might not be sufficiently attentive." *M. F.*, 294 Or App at 699. Hence, the state failed to prove that father's parenting skills were so inadequate that it created a current threat of serious loss or injury to A that was likely to be realized. Because the evidence does not support a nonspeculative inference that father's parenting skills put A at risk of serious harm or injury, the court erred when it took jurisdiction on that basis.

B.  *Substance Abuse*

As an initial matter, the problem with the connection between father's drug use and the harm to A becomes

apparent when we take into account the trial court's finding that, on this record, "we don't know when he uses or who he uses around or how often he does that." On appeal, DHS acknowledges, and we agree, that the juvenile court erred to the extent that it asserted jurisdiction when there was a lack of evidence about whether father currently used methamphetamine, or how that use, if any, posed a current threat of serious loss or injury to A.

Nevertheless, DHS contends that "the trial court correctly found that father's substance abuse created a reasonable likelihood of harm to A," because the risk of father "parenting while taking methamphetamine is so obvious that it hardly needs to be described." In essence, DHS argues that it is obvious that, because father has a history of using methamphetamine, father is likely to use methamphetamine in the future and "disengage and stop paying attention to A." But without any evidence about "when [father] uses or who he uses around or how often he does" use methamphetamine, the record cannot support a nonspeculative inference that father's historical methamphetamine use presented a current threat of serious loss or injury to A.

As discussed above, the last UA that father took that tested positive for methamphetamines was in January—nearly five months before the hearing—and, although he missed several UAs and treatment classes after his back surgery, the UAs were not court ordered and his participation in treatment was voluntary. Furthermore, father did not test positive for drugs when he voluntarily took a UA two weeks before the hearing. *See A. W.*, 276 Or App at 280 (concluding that the evidence supporting DHS's allegation of substance abuse was insufficient to justify jurisdiction because, although the mother tested positive for methamphetamine on one occasion and admitted to other use, there was no evidence that the mother used drugs while caring for the child or that the mother's drug use had any effect on her parenting); *Dept. of Human Services v. E. M.*, 264 Or App 76, 82-83, 331 P3d 1054 (2014) (concluding that the evidence was insufficient to show that the mother's substance abuse interfered with her ability to safely parent the child; although the mother had tested positive for drug use while pregnant with the child, the mother had tested negative for

drug use after the child's birth, and there was no evidence of any problematic drug use by the mother at the time of the hearing that put the child at a nonspeculative risk of serious loss or injury). Father's historical drug use, combined with his sporadic participation in voluntary drug treatment following his back surgery, is insufficient to establish that father was currently using controlled substances in a way that posed a current threat of serious loss or injury to A at the time of the hearing. *See J. J. B.*, 291 Or App at 239 (the "fact of substance abuse alone is insufficient to create jurisdiction under well-established case law"). Accordingly, the trial court erred when it asserted jurisdiction over A based on father's substance abuse.

C.  *Parenting Skills and Substance Abuse Considered Together*

DHS contends that, "[e]ven if the evidence supporting either allegation, standing alone, were insufficient, the evidence supporting both allegations, viewed in their totality, was sufficient for the trial court to establish jurisdiction over A." "DHS is correct that we do not view each allegation in a dependency petition in isolation, but must consider each allegation in connection with any other allegations because *sometimes* two allegations together present a more compelling case than either alone." *Dept. of Human Services v. G. J. R.*, 254 Or App 436, 443, 295 P3d 672 (2013) (emphasis added; internal quotation marks omitted). However, we have also observed that "the sum is not always greater than the whole of its parts," and that "[a]sserting multiple bases for jurisdiction does not lessen DHS's burden of proof." *J. J. B.*, 291 Or App at 239-40.

Here, because there is "no evidence of a material relationship" between father's alleged substance abuse and his ability to attend to A's needs, the evidence is insufficient to prove that father's substance abuse contributed to the overall risk that father would be inattentive to A's needs. *Id.* at 239. For example, DHS offered no evidence that father's failure to stop A from picking up scissors or running out of the room to find her mother and siblings during visitations was due to father being in a drug-affected state. *See Dept. of Human Services v. M. Q.*, 253 Or App 776, 786-87, 292 P3d

616 (2012) (concluding that, although the father's excuses for missing a UA would support a determination that he was not credible, it would not support an inference that the father continued to use drugs where the UAs were voluntary and the father had never been seen in a drug-affected state during his visitations with the child). Nor did DHS offer evidence that father used drugs in front of A or that he exposed A to dangerous people or situations because of his drug use. To the contrary, father reported his concerns about mother's drug use and the potential physical abuse A was suffering while in her mother's care. Perhaps on a more developed record, DHS might be able to prove that father's drug use— if it is continuing—endangers A because it makes father more inattentive to A's needs, but, as noted above, "the fact of substance abuse alone is insufficient to create jurisdiction under well-established case law." *J. J. B.*, 291 Or App at 239; *see id*. at 239-40 (concluding that it was not "reasonable to infer a meaningful connection between substance abuse and domestic violence based on a single incident of father getting upset with mother when they may have been under the influence of methamphetamine").

Because the evidence does not support a nonspeculative inference that father's substance abuse affected his parenting skills in a way that put A at risk of serious harm or injury, this is not a case in which two interrelated allegations have a synergistic effect that is sufficient to establish jurisdiction. Whether we view the allegations alone or together, we conclude that the juvenile court erred when it asserted jurisdiction over A.

## III.   CONCLUSION

In sum, DHS failed to carry its burden to demonstrate that father's alleged substance abuse or deficits in parenting skills posed a current risk of loss or serious injury to A. Therefore, the trial court erred in taking jurisdiction on those bases.

Reversed.